IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | |
|---|---|
| DIANA H., | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| HON. STEPHEN M. RUBIN, Judge of | ) |
| the Superior Court of the State of | ) |
| Arizona, in and for the County of Pima, | ) |
| | ) |
| Respondent, | ) |
| | ) |
| and | ) |
| | ) |
| ARIZONA DEPARTMENT OF | ) |
| ECONOMIC SECURITY, | ) |
| | ) |
| Real Party in Interest. | ) |
| | ) |

2 CA-SA 2007-0085
DEPARTMENT B

O P I N I O N

SPECIAL ACTION PROCEEDING

Pima County Cause No. 18180900

JURISDICTION ACCEPTED; RELIEF GRANTED

Judge Law Firm
  By Jeffrey Paul Judge                                                    Tucson

    and

Nuccio & Shirly P.C.
  By Jeanne Shirly                                                          Tucson
                                                    Attorneys for Petitioner

Terry Goddard, Arizona Attorney General                                    Tucson
   By Michelle R. Nimmo                              Attorneys for Real Party in Interest

---

E C K E R S T R O M, Presiding Judge.

¶1            At issue in this special action is whether the parent of a child who has been adjudicated dependent has the right to prohibit state-directed immunization of the child on the ground of the parent's religious belief. Petitioner Diana H. contends the respondent judge abused his discretion in granting a motion filed by the real party in interest, the Arizona Department of Economic Security (ADES), requesting authority to consent to immunizations for Diana's nine-month-old daughter, Cheyenne.  We accept special action jurisdiction because Diana has no "equally plain, speedy, and adequate remedy by appeal," Rule 1(a), Ariz. R. P. Spec. Actions, and because the petition raises a question of law that is "of statewide importance and of first impression," *ChartOne, Inc. v. Bernini*, 207 Ariz. 162, ¶ 9, 83 P.3d 1103, 1107 (App. 2004).  Because we conclude the dependency adjudication did not extinguish Diana's right to determine the religious upbringing of her child and because the state has not articulated a compelling interest in immunizing Cheyenne sufficient to override Diana's objection to the procedure, we grant relief.

**Background**

¶2            Diana did not contest the determination of dependency or dispute the facts contained in an amended dependency petition filed by ADES.  According to the amended petition, the Child Protective Services (CPS) division of ADES took temporary physical

2

custody of Cheyenne on March 26, 2007, and placed her in foster care. Cheyenne's doctor had expressed concern that the infant was "behind developmentally due to lack of proper nutrition." The petition also alleged that Diana "appear[ed] unable to protect" Cheyenne from her father, who had been arrested for domestic violence at the family's residence in early March 2007 and for assaulting Diana the following week. Although Diana had moved to a domestic violence shelter, she continued to deny that any episodes of domestic violence had occurred, and she was eventually asked to leave the shelter. Diana also acknowledged, but denied, reports that she abuses alcohol.

¶3        After CPS had taken temporary custody of Cheyenne but before the dependency adjudication, Diana had told CPS she objected on religious grounds to having Cheyenne immunized. Diana also presented ADES with a written request that Cheyenne be exempted, based on Diana's religious beliefs, from the immunization requirements that otherwise apply to children enrolled in Arizona child-care facilities. *See* Ariz. Admin. Code R9-5-305(A) (child-care facility may not permit attendance of child without "written immunization record or an exemption affidavit"); *see also* A.R.S. § 36-883(C) (Arizona Department of Health Services (ADHS) rules regarding immunization of children cared for in a child-care facility "shall include appropriate exemptions for children whose parents object on the ground that it conflicts with the tenets and practices of a recognized church or religious denomination of which the parent or child is an adherent or member"). As a result,

3

ADES moved the court for authority to consent to immunizations for Cheyenne, over Diana's objection, on the ground that they were medically necessary and in Cheyenne's best interests.

¶4 On May 30, 2007, the respondent judge adjudicated Cheyenne a dependent minor; awarded legal care, custody, and control of Cheyenne to ADES; directed that she remain in her current foster placement; and affirmed reunification with Diana as the case plan goal. Based on an agreement between Diana and ADES, the judge also scheduled an evidentiary hearing on the issue of immunizations.

¶5 At that hearing, ADES first called Cheyenne's CPS case manager. He testified that the child-care center Cheyenne had been attending, where her foster mother was also employed, was requiring evidence of immunization as a condition of Cheyenne's continued attendance.[1] He opined that it was in Cheyenne's best interests to remain at that facility "[b]ecause she[had] become accustomed to that day care [and] because the foster parent works there as well and has daily contact with the child."

¶6 ADES then called Cheyenne's pediatrician, Mimi Peterson, who testified the purpose of immunizing children during their first year of life is "to prevent illnesses that are

---

[1]The basis for an Arizona child-care facility's purported refusal to accept an exemption affidavit in lieu of an immunization record is unclear. ADES asserted in its motion that Arizona child-care facilities are not required "to enroll children who are permanently exempt from the immunization requirement." But that assertion is not supported by relevant provisions in the Arizona Administrative Code and appears inconsistent with the mandate of § 36-883(C). *See* Ariz. Admin. Code R9-5-305(A); R9-6-705(D) (child having documented exemption from immunization shall be deemed "in compliance with an immunization requirement").

4

threats to the health of children in that age group." Peterson stated that immunizations are medically necessary to avoid a "significant risk to the health and sometimes the life of [a] child." She noted that Cheyenne had not yet received any immunizations and that, ordinarily, a child of her age would have received fifteen scheduled immunizations against hepatitis B, *haemophilus influenzae* type b (Hib), tetanus, diphtheria, pertussis, rotavirus, polio, and pneumococcus.

¶7 When asked if any of these illnesses were potentially fatal for infants, Peterson testified that, currently, the highest risk for children in the local community is probably pertussis, commonly referred to as "whooping cough." She reported having seen several dozen cases of pertussis in her pediatric practice the previous winter and explained that pertussis is "fairly widespread in the teenager and adult community." As a result, an infant who has not been immunized against pertussis risks exposure to the bacteria "in the grocery store, in the mall, any place you're likely to encounter [the] general population." According to Peterson, while adults and teenagers face no significant health risk from the illness and may regard it as "just a prolonged cough that's a nuisance," the life and health of an infant who contracts pertussis are "at high risk."

¶8 Addressing the risks posed by the other diseases against which infants are ordinarily immunized, Peterson stated that the second greatest risk would be from Hib, the bacterial cause of meningitis, followed by pneumococcus, rotavirus, and tetanus. Peterson testified that, during the past year, none of her patients had contracted Hib or tetanus; many

5

had had ear infections caused by pneumococcus, but none had suffered the more serious complications that can occur; and about forty had become ill with rotavirus.

¶9          At the close of the evidence presented by ADES, Diana asked if the court intended to "inquire . . . about the quality of the religious belief or [if it] accepts that the exemption is valid." In response, ADES argued that Diana's request for an exemption was invalid because Cheyenne was already in protective custody when Diana executed the form. After ADES conceded it did not "have any evidence suggesting that [Diana's] religio[us] belief isn't sincere," the court declined to hear testimony on the issue. Diana closed the evidentiary portion of the hearing with an offer of proof that, if called as a witness, an assistant to her attorney would testify that she had contacted representatives of thirty-four child-care facilities in the community and all but three had indicated they would accept immunization exemptions for a child of Cheyenne's age.

¶10          The respondent judge issued a written ruling granting the state's motion, explaining his reasoning as follows:

> The Court bases its ruling on the medical testimony of Dr. Peterson as well as the Court's finding that the Mother's request for exemption was invalid, having been executed after the Court had ordered that [ADES] have temporary legal custody and physical custody of the minor.
>
> The court finds that the immunizations are in the child's best interest and are necessary for the child's safety.

¶11          Diana then petitioned this court for special action relief. At her request, we have stayed the respondent judge's order during the pendency of these proceedings.

6

**Discussion**

¶12 It is beyond debate that parents have a fundamental liberty interest protected by the Fourteenth Amendment "in the care, custody, and management" of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394-95 (1982); *Kent K. v. Bobby M.*, 210 Ariz. 279, ¶ 24, 110 P.3d 1013, 1018 (2005); *In re Cochise County Juvenile Action No. 5666-J*, 133 Ariz. 157, 161, 650 P.2d 459, 463 (1982). Concomitant with that interest, and independently protected by the Free Exercise Clause of the First Amendment, is the right of parents to guide the religious upbringing of their children. *Wisconsin v. Yoder*, 406 U.S. 205, 213-14, 92 S. Ct. 1526, 1532 (1972).

¶13 But those rights are not absolute. "The state has an interest in the welfare and health of children." *Cochise County No. 5666-J*, 133 Ariz. at 161, 650 P.2d at 463. "If the interest of the state is great enough—that is, if the welfare of the child is seriously jeopardized—the state may act and invade the rights of the parent and the family." *Id.* Here, through the adjudication of dependency, a court has already determined that the state's interest in Cheyenne's health and welfare entitled the state, through its agency, ADES, to temporarily invade Diana's right to physical and legal custody of her child. Diana has not disputed the propriety of the dependency determination.

¶14 She maintains, however, that the adjudication of dependency awarding ADES temporary legal custody of Cheyenne did not extinguish her status as a parent nor all of her parental rights. Rather, Diana contends that, pursuant to statute she retains "residual parental

7

rights," including the right to determine the religious affiliation of her child and, therefore, the right to decline, in conformity with those religious beliefs, to have Cheyenne immunized.

¶15    The statute articulating the comparative rights of the state and parent upon an adjudication of dependency is A.R.S. § 8-531(5). Pursuant to that statute, when awarded legal custody of a dependent child, ADES acquires

> a status embodying all of the following rights and responsibilities:
>
> (a) The right to have physical possession of the child.
>
> (b) The right and the duty to protect, train and discipline the child.
>
> (c) *The responsibility to provide the child with* adequate food, clothing, shelter, education and *medical care*, provided that such rights and responsibilities shall be exercised subject to the powers, rights, duties and responsibilities of the guardian of the person[2] and *subject to the residual parental rights and responsibilities* if they have not been terminated by judicial decree.[3]

*Id.* (emphases added). Thus, the state's responsibility to provide medical care for a dependent child is expressly "subject to" a body of parental rights and duties retained by the parent.

---

[2]A child determined to be dependent is a ward of the juvenile court. *In re Maricopa County Juv. Action No. JD-6236*, 178 Ariz. 449, 451, 874 P.2d 1006, 1008 (App. 1994).

[3]Diana's residual parental rights have not been terminated, and the juvenile court approved a case plan of family reunification.

¶16        Our legislature has not defined the phrase "residual parental rights," nor has any published Arizona decision considered its meaning.  But several other states have expressly defined the phrase, when used in the same context, to include a parent's right to determine the religious affiliation of a child.  *See, e.g.*, Ala. Code § 12-15-1(24) (1975); Colo. Rev. Stat. Ann. § 19-1-103(93) (West 1999); Ohio Rev. Code Ann. § 2151.011(A)(46) (Lexis Nexis 2007); Va. Code Ann. § 16.1-228 (1999).  And ADES conceded during appellate oral argument that the phrase "residual parental rights" encompasses a parent's right to determine the religious upbringing of his or her child.

¶17        Moreover, we understand our legislature's use of the term "residual" to denote "that which remains."  *See, e.g., Webster's Third New Int'l Dictionary* 1931 (1971) (defining "residual" as that which is "remaining after a part is taken").  As used in § 8-531(5), the term suggests the legislature intended that parents would retain those rights not expressly acquired by ADES upon an adjudication of dependency.  Neither § 8-531(5) nor any other provision grants the state affirmative authority to make decisions concerning the religious upbringing of a dependent child.  Nor could the state assume any role in choosing specific religious instruction for a child during a dependency proceeding without running afoul of federal and state constitutional provisions.  *See* U.S. Const. amends. I; XIV, § 1 (state may not establish a religion); Ariz. Const. art. II, § 12 ("No public money . . . shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any religious establishment.").  We conclude, therefore, that a dependency determination does not

9

extinguish a parent's right to control the religious upbringing of his or her child because, by the terms of the statute defining "legal custody," the right never passes to the state.

¶18    But that conclusion does not end our inquiry.  Section 8-531(5) gives the legal custodian of a dependent child the responsibility "to provide the child with . . . medical care." Indeed, ADES is expressly required to "provide comprehensive medical . . . care, as prescribed by rules of [ADES], for each child . . . [p]laced in a foster home."  A.R.S. § 8-512(A)(1).  And, in § 8-512(B)(1)(a), the legislature has directed that such care "may include, but is not limited to . . . [a] program of regular health examinations and immunizations including as minimums . . . [v]accinations to prevent mumps, rubella, smallpox and polio."  According to ADES rules, "[t]he goal of the Comprehensive Medical/Dental Program for Foster Children is to provide . . . full coverage for those medical and dental services which are necessary to the achievement and maintenance of an optimal level of physical and mental health for children in foster care."  Ariz. Admin. Code R6-5-6001.  For those reasons, ADES is correct that § 8-512 explicitly authorizes it to "consent to and provide immunizations to a dependent child in foster care."

¶19    This case, then, requires us to address the conflict between the state's particular interest in immunizing children to promote their health and welfare, and Diana's constitutional and statutory right to direct the religious upbringing of her child.  "[W]hen discussing religious freedoms and the state's interest in providing for the welfare of children, the 'accommodation between these freedoms [of religion] and an exercise of state authority

10

always is delicate.'" *Cochise County No. 5666-J*, 133 Ariz. at 163, 650 P.2d at 465, *quoting Prince v. Massachusetts*, 321 U.S. 158, 165, 64 S. Ct. 438, 441 (1944) (second alteration in *Cochise County No. 5666-J*).

¶20        The United States Supreme Court has provided some guidance for performing that delicate task.  In *Yoder*, an Amish father sought to exempt his children from a Wisconsin compulsory-school-attendance law, arguing that school attendance after eighth grade interfered with central tenets of his family's faith.  406 U.S. at 207-13, 92 S. Ct. at 1529-32.  Although acknowledging the state's strong and traditional interest in providing education, the Court found that interest "not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children."  *Id.* at 213-14, 92 S. Ct. at 1532.

¶21        The Court in *Yoder* did not articulate a precise formula for weighing a valid state interest against those parental rights.  But it emphasized that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."  *Id.* at 215, 92 S. Ct. at 1533.  Thus, the Court suggested that a state must demonstrate a compelling interest to justify overriding the combination of religious and parental rights involved.  *Id.* at 221, 92 S. Ct. at 1536 (addressing whether state's interest in compulsory education "is so compelling that even the established religious practices of the Amish must give way").

11

¶22         Although our dissenting colleague suggests *Yoder* is distinguishable on its facts and therefore its test does not apply here, our own supreme court has utilized that test in the context of similar, if not identical, state and parental interests.  *See Cochise County No. 5666-J*, 133 Ariz. at 163, 650 P.2d at 465 (applying *Yoder* in "balancing the interests of religious freedom" against the state's interest in medical care for children ).  More recently, the United States Supreme Court has acknowledged that the state must assert a compelling interest when an exercise of its authority directly conflicts with the combination of religious and parental rights.  *See Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 881, 110 S. Ct. 1595, 1601 (1990) (characterizing free-exercise claim coupled with parenting right as hybrid situation retaining heightened protection).

¶23         In applying the *Yoder* test here, we do not dispute that, as a general proposition, a state has an interest of the highest order in the health and welfare of its children.  *In re Maricopa County Juv. Action No. JD-6123*, 191 Ariz. 384, 392, 956 P.2d 511, 519 (App. 1997) ("[T]he state and its citizens have a compelling state interest in ensuring that all children in Arizona are provided with appropriate care and are free from parental abuse or neglect."); *see also State v. Berger*, 212 Ariz. 473, ¶ 18, 134 P.3d 378, 382 (2006) (state's compelling interest in mental and physical health of children self-evident), *citing Osborne v. Ohio*, 495 U.S. 103, 109, 110 S. Ct. 1691, 1696 (1990).  When a state expresses such an interest through particular legislation, its policy judgments are entitled to judicial deference.  *Id.* ¶¶ 59-60 (Hurwitz, J., concurring).  Within constitutional bounds, it is for the legislature,

12

not the courts, to assess the comparative importance of public health initiatives, such as immunization requirements, when those initiatives arguably compromise other social values, such as those Diana asserts. Consequently, when a state exercises its authority to protect "a child's right to good health" and that exercise directly conflicts with a parent's religious rights, the parent's rights must generally "give way." *Cochise County No. 5666-J*, 133 Ariz. at 163, 650 P.2d at 465.

¶24 Arizona has not so exercised its authority in the context of immunization policy, however. Our legislature has neither expressly nor implicitly articulated any compelling interest in immunizing children over the religious objections of their parents. To the contrary, in legislation directly applicable to the competing interests here, our state has struck the balance in favor of the parent.

¶25 The record demonstrates that ADES has sought to immunize Cheyenne, in part, because the child-care center she attends, where her foster mother also works, has been insisting that Cheyenne be immunized as a condition of her continued attendance. Yet our legislature has specifically provided that children need not be immunized to attend child-care facilities if their "parents object on the ground that [immunization] conflicts with the tenets and practices of a recognized church or religious denomination of which the parent or child is an adherent or member." § 36-883(C). The legislature has similarly qualified its interest in the immunization of children attending public schools, whose parents may exempt their

13

children from immunization based on any "personal beliefs." A.R.S. § 15-873(A)(1).[4] Thus, far from asserting a state interest in immunization sufficiently compelling as to overcome Diana's right to determine the religious upbringing of her child, Arizona law instead repeatedly honors faith-based parental objections to immunization.

¶26        ADES maintains that these statutes do not necessarily reflect a legislative judgment that Diana's interest should outweigh the state's interest in immunization. Specifically, ADES contends the legislature would not have struck the same balance in favor of parents like Diana who have been judicially determined to be temporarily incapable of exercising "proper and effective parental care and control" of her child. A.R.S. § 8-201(13). In the same vein, our dissenting colleague suggests we erroneously read the immunization and dependency statutes *in pari materia*, in his view "essentially a mixing of apples and oranges."

¶27        But we can find no language whatever in Arizona's dependency or immunization statutes suggesting that the few residual rights of a parent whose child has

_____

[4]Section 15-873(A)(1) provides that documentary proof of immunization is not required for a child to be admitted to school if

> [t]he parent . . . submits a signed statement to the school administrator stating that the parent or guardian has received information about immunizations provided by the department of health services and understands the risks and benefits of immunizations and the potential risks of nonimmunization and that due to personal beliefs, the parent or guardian does not consent to the immunization of the pupil.

14

been adjudged dependent should carry any less weight than those of other parents.[5] Instead, through the language it chose to use in § 8-531(5), our legislature has preserved Diana's continuing right to determine Cheyenne's religious upbringing notwithstanding the adjudication of dependency. As discussed, the statute provides that, even in dependency proceedings, ADES's right and duty to provide the child medical care is "subject to" the few remaining rights of the parent. § 8-531(5)(c).

¶28    And, we need not read the dependency and immunization statutes *in pari materia* in order to conclude that § 8-531(5)(c) preserves Diana's right to determine the religious upbringing of her child. Rather, § 8-531(5)(c), standing alone, confers an entitlement to exercise that right in the context of other relevant Arizona statutes. As noted, Arizona's immunization statutes expressly honor and empower that particular parental interest. Even in the child dependency context, our legislature has elevated the religious rights of a parent above its own interest in assuring children access to conventional medical care. *See* A.R.S. § 8-201.01(1) ("A child who in good faith is being furnished Christian

---

[5]We do not dispute our dissenting colleague's undoubtedly correct observation that our legislature is entitled to make appropriate legal distinctions between "fit" and "unfit" parents, *Troxel v. Granville*, 530 U.S. 57, 67-69, 120 S. Ct. 2054, 2061-62 (2000), and to define its "*in loco parentis*" interest as it sees fit. We also agree that the Arizona legislature could require immunization of all children without exception. *See Prince v. Massachusetts*, 321 U.S. 158, 166-67, 64 S. Ct. 438, 442 (1944). But we address here not the lawful boundaries of hypothetical legislation but the intent actually conveyed by our currently applicable statutes.

15

Science treatment by a duly accredited practitioner shall not, for that reason alone, be considered to be an abused, neglected or dependent child.").

¶29 During oral argument, ADES suggested the *Yoder* test should not apply here because Diana has not made a concrete showing, equivalent to that made by the Amish parent in *Yoder*, that allowing Cheyenne to be immunized would substantially insult the tenets and practices of her family's faith. We disagree. The record is clear that Diana objected to the immunization on a religious ground and that she had submitted the appropriate form asserting her intent to exempt Cheyenne from immunization on that ground. Without contradiction or objection, Diana's counsel also asserted below that, according to her faith, immunization involves polluting a person's blood "with something that's inappropriate."

¶30 When Diana offered to present testimony about the specific "quality" of her religious faith, ADES responded that it had no evidence suggesting her religious beliefs were insincere. In context, we view this as a concession by ADES that Diana's objection to immunizing Cheyenne stemmed from *bona fide* religious views Diana holds. Moreover, this court is not equipped with any principle of law or logic to weigh the relative importance of the religious principles involved here against those asserted in *Yoder*. *See Smith*, 494 U.S. at 887, 110 S. Ct. at 1604 ("Judging the centrality of different religious practices [to a faith] is akin to the unacceptable 'business of evaluating the relative merits of differing religious claims.'"), *quoting United States v. Lee*, 455 U.S. 252, 263 n.2, 102 S. Ct. 1051, 1058 n.2 (1982) (Stevens, J., concurring).

16

**¶31**        As ADES correctly asserts, under Arizona's statutory scheme, it is the best interests of the child, not the parent, that are paramount in a dependency proceeding. *See* A.R.S. § 8-843(A) ("At any dependency hearing, the court's primary consideration shall be the protection of a child from abuse or neglect."); *see also* A.R.S. § 8-845(B) ("In reviewing the status of the child and in determining its order of disposition, the court shall consider the health and safety of the child as a paramount concern . . . ."). But the Department overlooks that the pertinent statutes also embody a legislative judgment that a child's interests are best served by the presumptive goal of reunifying parent and child. *See* § 8-845(C) ("In reviewing the status of the child, the court, insofar as possible, shall seek to reunite the family."); *see also* § 8-843(E)(1) (at initial dependency hearing "the court shall order the department to make reasonable efforts to provide services to the child and parent to facilitate the reunification of the family"); A.R.S. § 8-812(C) (establishing treatment fund "with a primary goal of facilitating family preservation or reunification, including, if necessary, services that maintain the family unit in a substance abuse treatment setting"). The presumptive goal of family reunification in turn suggests a state interest in fostering a parent's continued engagement in the upbringing of the dependent child to the extent possible, even after legal custody of the child has passed to the state.

**¶32**        Moreover, the medical procedure at issue, immunization, is irreversible. For that reason, we think it unlikely that our legislature would have viewed the presumptively temporary legal status of dependency as pivotal in weighing the importance of a non-urgent,

17

irreversible procedure against the parent's long-term interest in raising a child and determining the child's religious upbringing. Certainly, we cannot assume that such a temporary status would necessarily alter the legislative judgment clearly expressed in Arizona's general immunization statutes that a parent's religious rights outweigh the state's interest in the immunization of children.[6]

¶33 As the United States Supreme Court has observed:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.

*Santosky*, 455 U.S. at 753, 102 S. Ct. at 1394-95. Because Arizona's statutory scheme for protecting the welfare of abused and neglected children recognizes that interest, both by expressly preserving residual parental rights and by promoting the eventual reunification of child and parent, we must reject ADES's suggestion that those very statutes implicitly reflect a compelling state interest in immunizing a dependent child over the parent's religious objections.

¶34 In his dissent, our colleague expresses concern that our holding will enable parents of dependent children to meddle in ADES's efforts to pursue the best interests of

---

[6]Obviously some dependencies do culminate in the permanent termination of the parent-child relationship, an event that extinguishes any remaining parental rights. *See* A.R.S. § 8-539. In those cases, nothing prevents the state from arranging to have the child immunized after the parent's rights have been severed.

18

those children. However, our supreme court has instructed that, when courts mediate the delicate accommodation between state interests and the constitutional rights of the parent, "[e]ach case must by necessity be decided on its own facts." *Cochise County No. 5666-J*, 133 Ariz. at 164, 650 P.2d at 466 (parent's mere refusal, on religious ground, to seek medical attention for her children insufficient basis for dependency adjudication). Contrary to our dissenting colleague's assertion, ADES presented no evidence that permitting Cheyenne to remain unimmunized posed an imminent risk to her health. Moreover, had the record demonstrated that Cheyenne's specific need for immunization was greater than that of the average child, we could no longer rely on our state's general immunization policy in gauging the stature of the state interest involved. And, we follow our supreme court's lead in emphasizing that, under most circumstances, the state's interest in safeguarding the health and welfare of children will override a parent's constitutionally protected interest in determining the child's religious upbringing. *Id.* ("[W]e emphasize that if we were faced with an actual illness of one of the . . . children, the scales would have tipped and religious freedoms would be forced to yield.").

¶35        For example, we would not hesitate to find a compelling state interest had the Department shown that Cheyenne was especially vulnerable to the diseases prevented by immunization, due perhaps to malnutrition or some other medical condition.[7] But the

_____

[7]Dr. Peterson testified that Cheyenne was in "[e]xcellent health" at the time of her last checkup and "was in the 50th to 75th percentile" for weight.

evidence addressed only the health risks common to all children that are preventable by immunization. We must assume the legislature considered those risks when it drafted Arizona's immunization statutes to include the exemptions for religious beliefs.[8] As we have observed, those statutes incorporate a policy decision to honor parental rights—a decision we have no authority to second-guess.

¶36 Relying on *In re Karwath*, 199 N.W.2d 147 (Iowa 1972), and *In re Stratton*, 571 S.E.2d 234 (N.C. App. 2002), ADES argues that courts of other states have come to a different conclusion when weighing the state's interest in the welfare of a dependent child against a parent's faith-based objections to a medical procedure. But those cases involved different governmental and parental interests than those asserted here and are, therefore, readily distinguishable.

¶37 In *Karwath*, the Iowa Court of Appeals weighed the medical needs of three dependent children for tonsillectomies against their father's faith-based objection to the procedure. 199 N.W.2d at 149. With little analysis, the court tersely concluded that, "[w]here the best interests of children are involved[,] even parental preference based upon asserted religious belief may be required to give way." *Id.* at 150. But, the Iowa court was unconstrained by legislation, like Arizona's, expressly subordinating the state's health and

---

[8]In considering those risks, we must also assume that the legislature contemplated any special risks posed to infants, given that it embedded an exemption for religious beliefs in its immunization scheme relating to child-care facilities, an exemption that necessarily applies to both infants and children.

welfare interest in the medical procedure at issue to the father's religious interest in the upbringing of his children—the central consideration here. Moreover, the evidence clearly established that the surgeries were necessary "with reasonable medical certainty to restore and preserve the health of *these wards* of the State." *Id.* (emphasis added). Here, as seen, there was no showing that Cheyenne's need for immunization was any greater than that of a nondependent child.

¶38 In *Stratton*, the court addressed parental religious objections to a dependent child's immunization under a general immunization statute similar to Arizona's. 571 S.E.2d at 236. But there the parents did not claim to possess any residual parental rights under North Carolina dependency law, and the court rejected their contentions on the ground that all such rights had been extinguished by the dependency determination. *Id.* at 237-38 ("Once it has been determined that a parent is unfit or has neglected his child, the parent loses his decision-making ability as of right."). By contrast, Diana has an interest of constitutional stature, expressly preserved by Arizona statute, to direct the religious upbringing of her child. Thus, while we generally agree with the reasoning in both *Karwath* and *Stratton*, neither case provides much assistance in resolving the issue here.

## CONCLUSION

¶39 Generally, when the state exercises authority to direct compliance with a medical procedure to promote the health and welfare of a dependent child, it asserts a compelling interest in the child's well-being sufficient to override the parent's right to direct

21

the religious upbringing of his or her child. However, we must evaluate each case, and the state interest involved, on its own facts. When, as here, the state has qualified its *in loco parentis* status in dependency so as to preserve a specific parental right and has, in other legislation, subordinated its interest in a particular medical procedure to that parental right, we exceed our role if we disregard those legislative determinations, no matter how wise or foolish we may consider them to be. Because Arizona has not expressed a compelling state interest in overriding Diana's continuing right to direct the religious upbringing of her child while Cheyenne remains dependent, *see Yoder*, 406 U.S. at 215, 92 S. Ct. at 1533, we vacate the juvenile court's order authorizing ADES to have Cheyenne immunized.

_____
PETER J. ECKERSTROM, Presiding Judge

CONCURRING:


_____
GARYE L. VÁSQUEZ, Judge


E S P I N O S A, Judge, dissenting.

¶40        I respectfully disagree with the majority's result and reasoning because, in my view, it effectively elevates the rights of the irresponsible parent over the needs of an innocent child and justifies it by patching together constitutional doctrines and statutes that

22

have no bearing on the situation at hand. As the majority acknowledges, if somewhat hollowly, even fundamental religious rights are not absolute when it comes to the best interests of a child.

¶41　　　At the outset, I appreciate the majority's concern that ADES's custody of Cheyenne is temporary and the case plan goal is reunification. But Cheyenne could remain in ADES custody for more than a year until permanent custody is resolved, *see* A.R.S. §§ 8-533(B)(8)(b) and 8-862(A)(2) and (C), and no evidence in the record supports the majority's conclusion that her immunization is "non-urgent," ¶ 32, *supra*. To the contrary, the evidence is undisputed that permitting Cheyenne to remain "unimmunized poses significant risks to the health and sometimes the life of the child," even more so here in view of Peterson's testimony that even routine infections can be life-threatening to an infant of Cheyenne's age. Thus, although the majority maintains that "nothing prevents the state from arranging to have the child immunized after the parent's rights have been severed," n.6, *supra*, if that is the ultimate result of the dependency proceedings, such delay is unacceptable in light of the statutory obligations of ADES and the juvenile court to protect this child and the unchallenged medical testimony that her immunizations are medically necessary now. The respondent judge's decision that immunization is in Cheyenne's best interest and necessary for her safety is supported by reasonable evidence in the record, was not an abuse of discretion, and is entitled to our deference. *See In re Maricopa County Juvenile Action No. JD-6236*, 178 Ariz. 449, 451, 874 P.2d 1006, 1008 (App. 1994) (appellate court

23

"generally deferential when the juvenile court exercises its substantial discretion to make placement decisions in the best interest of dependent juveniles . . . [and] review[s] such orders for abuse of discretion") (citation omitted).

¶42 As a matter of constitutional law and statutory construction, there is little support for the majority's premise that the state must establish a compelling interest in the specific procedure of immunization because Diana has objected to that procedure on religious grounds. And there is equally scant foundation for the majority's conclusion that Arizona has "legislatively subordinated" any state interest in immunization, including its interest in immunizing a dependent child in its custody, to a parent's religious objection. The majority has erred as a result of its misplaced reliance on *Yoder*; its failure to appreciate the difference between the state's general interest in child welfare and its particular custodial interests and obligations with respect to Cheyenne as a dependent child; and its insistence that statutes reflecting the state's general public health interest in immunization, which defer to a parent's religious objection, necessarily modify the state's more particular obligation under Title 8, A.R.S., to provide medical care for a dependent child. As a result, the majority's limitation on the juvenile court's authority is unsound as a matter of both jurisprudence and state public policy.

**Constitutional Considerations**

¶43 The majority relies on *Yoder* for "guidance" in this context while failing to recognize crucial distinctions between that case and the circumstances presented here. In

24

*Yoder*, the Supreme Court found the state's *parens patriae*[9] interest in compulsory secondary education insufficient to overcome the interest of an Amish parent who had shown that such regulation would "gravely endanger, if not destroy, the free exercise of [Amish] religious beliefs." *Yoder*, 406 U.S. at 219, 229, 92 S. Ct. at 1535, 1540. The father in *Yoder* had demonstrated "the adequacy of their alternative mode" of vocational instruction to accomplish the overall interests advanced by the state, *id.* at 235, 92 S. Ct. at 1543, and had "introduced persuasive evidence . . . that accommodating [their] religious objections . . . [would] not impair the physical or mental health of [their] child[ren]," *id.* at 234, 92 S. Ct. at 1542. However, the Court observed, "To be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitation under *Prince* [*v. Massachusetts*, 321 U.S. 158, 64 S. Ct. 438 (1944),] if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Id.* at 233-34, 92 S. Ct. at 1542.

¶44     In *Prince*, the Supreme Court had upheld the state conviction of a Jehovah's Witness for permitting her niece, a child in her legal custody, to sell publications on the street in violation of state child labor law. 321 U.S. at 159, 64 S. Ct. at 439. The Supreme Court recognized as a cardinal principle "that the custody, care and nurture of the child reside first in the parents," but added:

---

[9]"*Parens patriae*," Latin for "parent of his or her country," is defined as "the state in its capacity as provider of protection to those unable to care for themselves." *Black's Law Dictionary* 1144 (8th ed. 2004).

[N]either rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. . . . [T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and this includes, to some extent, matters of conscience and religious conviction.

*Id.* at 166-67, 64 S. Ct. at 442 (citations and footnotes omitted). The Court concluded:

Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves.

*Id*. at 170, 64 S. Ct. at 444.

¶45 *Yoder*'s critical distinction of parental decisions that jeopardize the health or safety of a child, and the specific reference in *Prince* to a state's authority to compel immunization despite a parent's religious objection, present the most obvious and fundamental differences between this case and *Yoder*. And unlike the parent in *Yoder*, Diana has provided no evidence that accommodating her religious objection would not impair Cheyenne's physical health and would constitute an adequate alternative to the state's interest

26

in providing Cheyenne with medically necessary care. Indeed, the undisputed evidence presented to the respondent judge required the contrary conclusion.

¶46        A less obvious but equally critical distinction between this case and *Yoder* involves the different interests at stake. As the majority concedes, "it is the best interests of the child, not the parent, that are paramount in a dependency proceeding." ¶ 31, *supra*. But the Supreme Court in *Yoder* pointedly did not address the "interest of the child as contrasted with that of the parents" or "the proper resolution of possible competing interests of parents, children, and the state." 406 U.S. at 230-31, 92 S. Ct. at 1541. In *Yoder*, the Court was concerned only with the "interest of parents, as contrasted with that of the state." *Id*. at 232, 92 S. Ct. at 1541. Specifically, the Court considered the power of the state to impose criminal penalties on Amish parents for refusing on religious grounds to send their children to school. *Id.* In contrast, this case raises the question of how the competing interests of a child, a parent, and the state are affected by a judicial determination that the parent is unwilling or unable to properly care for the child.

¶47        Since *Yoder* was decided, the Supreme Court has addressed the considerations relevant to a child's best interests and has made clear that deference to a parent's decisions about a child's care is dependent on "the traditional presumption that a fit parent will act in the best interest of his or her child." *Troxel v. Granville*, 530 U.S. 57, 70, 120 S. Ct. 2054, 2062 (2000) (plurality opinion) (court must afford "at least some special weight" to "fit" parent's decision regarding grandparental visitation). While generally recognizing the

27

"fundamental right of parents to make decisions concerning the care, custody, and control of their children," *id.* at 66, 120 S. Ct. at 2060, the Court explained the importance of the distinction between a "fit" and "unfit" parent when a child's best interests are at issue:

> [T]he Troxels did not allege, and no court has found, that Granville was an unfit parent. That aspect of the case is important, for there is a presumption that fit parents act in the best interests of their children. . . .  Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.

*Id.* at 68-69, 120 S. Ct. at 2061 (citation omitted).  To the extent the majority finds no basis to conclude that the "residual rights of a parent whose child has been adjudged dependent should carry any less weight than those of other parents," ¶ 27, *supra, Troxel* clearly provides that authority.

¶48        Here, Cheyenne's adjudication as a dependent child was a legal determination that she is "[i]n need of proper and effective parental care and control and . . . has . . . no parent or guardian willing to exercise or capable of exercising such care and control." § 8-201(13).  The state thus has every reason to question Diana's ability to make the best decisions for Cheyenne's care and no reason to presume that she would necessarily act in accordance with Cheyenne's best interests. *See Troxel*, 530 U.S. at 68-69, 120 S. Ct. at 2061. And the adjudication of dependency resulted in a compelling state interest that justifies the delegation of decisions about Cheyenne's care to the juvenile court. *Maricopa County No.*

28

*JD-6123*, 191 Ariz. at 392, 956 P.2d at 519. This interest is more than sufficient under *Yoder*. But because *Yoder* dealt only with parental rights, it provides little guidance here and no authority for limiting the juvenile court's discretion to make medical decisions for a dependent child.[10]

### State's Interest in Providing Medical Care for a Dependent Child

¶49 In my view, the majority also goes astray in characterizing the state's interest in this case as a general interest "in immunizing children to promote their health and welfare," ¶ 19, *supra*, and in asserting that public health regulations pertaining to immunizations required for child-care attendance are "directly applicable to the competing interests here." ¶ 24, *supra*. The state's interest in promoting the health and welfare of children describes the state's *parens patriae* interest with respect to *all* children residing in

---

[10]The majority's citation of *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S. Ct. 1595 (1990), ¶ 22, *supra*, does not alter the Supreme Court's acknowledgment that the *Yoder* case "in no way determines the proper resolution" of a conflict between a parent, the state, and a child, when a child's interests are at issue, *Yoder*, 406 U.S. at 231, 92 S. Ct. at 1541, as they are here. And it is doubtful that *Smith*—in which the Supreme Court generally rejected the strict scrutiny test for neutral laws of general applicability that incidentally burden religion, 494 U.S. at 878, 883, 110 S. Ct. at 1599-1602—has "reaffirmed" a compelling state interest requirement when a parent challenges a decision that affects her religious interests, ¶ 22, *supra*. *See, e.g., Leebaert v. Harrington*, 332 F.3d 134, 143-44 (2d Cir. 2003) (*Smith*'s "hybrid claims" language dicta; parent's religious objection to mandatory health education subject to rational basis review); *Douglas County v. Anaya*, 694 N.W.2d 601, 605-06 (Neb. 2005) (parent's objection to metabolic testing of infant did not implicate strict scrutiny under *Smith*); *see also Boone v. Boozman*, 217 F. Supp. 2d 938, 955 n.38 (E.D. Ark. 2002) (noting *Smith* included compulsory immunization of children as example of state action that should not be subject to compelling interest test; *citing Smith*, 494 U.S. at 888-89, 110 S. Ct. at 1605-06; *Cude v. State*, 377 S.W.2d 816, 818-20 (Ark. 1964)).

29

the state; it is the same interest identified by the Supreme Court in *Yoder* and *Prince* and by our supreme court in *Cochise County No. 5666-J*.

¶50        But, pursuant to § 8-531(4), ADES as Cheyenne's custodian now stands "*in loco parentis*" to Cheyenne—that is, "in the place of a parent." *Black's Law Dictionary* 803 (8th ed. 2004) ("Of, relating to, or acting as a temporary guardian or caretaker of a child, taking on all or some of the responsibilities of a parent"); *see Bryan v. Bryan*, 132 Ariz. 353, 354 n.1, 645 P.2d 1267, 1268 n.1 (App. 1982) ("*In loco parentis* is a status embodying two ideas; first, the assumption of a parental status, and second, the discharge of parental duties"); *see also Parham v. J. R.*, 442 U.S. 584, 619, 99 S. Ct. 2493, 2512 (1979) ("state agency having custody and control of the child *in loco parentis*" has duty to consider child's best interests and may "speak for the child" with respect to voluntary commitment to mental health facility).  ADES's interests and obligations resulting from its role *in loco parentis* in this case—distinct from its *parens patriae* interests and specific to Cheyenne as a dependent child—are governed by provisions of Title 8, and include a statutory duty to provide her with comprehensive medical care.  *See* §§ 8-512, 8-531(4).  As our supreme court has explained:

> [C]hildren are not property of their parents whose control may only be interrupted by a finding of fault; on the contrary, . . . children . . . have special needs and rights . . . protected by law[, including] the right to effective and proper parental control and care.  If a child is found to be without such parental care and control and without parents willing or capable of exercising such care and control, the child is a dependent child and entitled to have such care and control furnished through the state.

30

*In re Maricopa County Juvenile Action No. J-75482*, 111 Ariz. 588, 590-91, 536 P.2d 197, 199-200 (1975).[11]

¶51        Courts in other jurisdictions have recognized, in similar circumstances, that when the state's custodial interest in providing medical care to a dependent child conflicts with a parent's religious interest, a court must resolve the conflict based on the best interests of the child. For example, in *In re Karwath*, 199 N.W.2d 147, 149 (Iowa 1972), the parent of dependent children asserted his residual parental right to challenge, on religious grounds, tonsillectomies that had been recommended for the children to prevent recurring infections. The Iowa Supreme Court concluded that the state's "statutory duty to provide ordinary medical care presupposes a right to do so in appropriate circumstances over parental objection even in [the] absence of immediate risk to life or limb." *Id.* at 150. Thus, "where the best interests and welfare of children in care and custody of the State reasonably require medical treatment opposed by a parent, residual parental rights cannot be invoked to prevent it." *Id.*

---

[11]In my view, proper analysis of Diana's request for relief requires recognition of this crucial distinction between the state's limited *parens patriae* authority to interfere with a fit, custodial parent's decision and "invade the rights of the parent and the family," *see Cochise County No. 5666-J*, 133 Ariz. at 161, 650 P.2d at 463, and its obligation, acting *in loco parentis*, to provide for the needs of a dependent child whose parents have been found unable to do so. *See Pima County No. J-78632*, 147 Ariz. at 587, 712 P.2d at 434 (noting ADES's custodial responsibilities to dependent children). The majority thus errs in concluding that *Cochise County No. 5666-J*, which pertained to state action against a custodial parent presumed to act in her children's best interests, involves "similar, if not identical, state and parental interests" as those implicated here, ¶ 22, *supra*.

31

**¶52**    *In re Stratton*, 571 S.E.2d 234 (N.C. App. 2002), is also persuasive. That case addressed the identical issue raised here:  parents whose children had been adjudicated dependent appealed a court order authorizing the children's legal custodian to have them immunized. *Id.* at 235.  The parents there maintained that, because their parental rights had not been terminated, they were entitled to assert a statutory exemption from North Carolina's mandatory immunization laws based on their "'bona fide religious beliefs.'"  571 S.E.2d at 236, *quoting* N.C. Gen. Stat. § 130A-157 (2001).  They contended that immunizing their children while in the temporary custody of the state would be a "violation of [their] constitutionally protected religious beliefs" that could not be justified in the absence of "medical emergency or other strong need for immunization."  571 S.E.2d at 236, 237.

**¶53**    The court in *Stratton* noted that "[North Carolina] courts do not have a history of routinely ordering the performance of medical procedures on children without parental consent" and acknowledged that "'the custody, care and nurture of the child reside first in the parents.'"  *Id.* at 433, *quoting Prince*, 321 U.S. at 166, 64 S. Ct. at 442.  But, the court reasoned,

> "A natural parent's constitutionally protected paramount interest in the companionship, custody, care, and control of his or her child is a counterpart of the parental responsibilities the parent has assumed and is based on a presumption that he or she will act in the best interest of the child.  Therefore, the parent may no longer enjoy a paramount status if his or her conduct is inconsistent with this presumption or if he or she fails to shoulder the responsibilities that are attendant to rearing a child. . . .  Unfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may

32

> enjoy. . . . " *Price v. Howard*, 346 N.C. 68, 79, 484 S.E.2d 528,
> 534-35 (1997) (citations omitted). Once unfitness, neglect or
> other action inconsistent with the parent's constitutionally
> protected interest has been found, a court should revert to a
> basic determination of what action is in the best interests of the
> child. *Id.* Here, the trial court found that immunization was in
> the best interest of the Stratton children.

*Stratton*, 571 S.E.2d at 237-38. *Stratton* correctly identifies the proper standard for a juvenile

court to apply to conflicts relating to the care of a dependent child: the best interests of the

child.

### Statutory Construction of A.R.S. § 8-512

¶54      The majority recognizes that a state may constitutionally require the

immunization of children despite a parent's religious objection, *see* ¶ 24, *supra*, and there can

be no serious question about this proposition. *See Prince*, 321 U.S. at 166-67, 64 S. Ct. at

442-43; *see also Brown v. Stone*, 378 So. 2d 218, 222 (Miss. 1979) (citing "'great weight of

authority'" holding that mandatory immunization laws "'do[] not violate the constitutional

rights of anyone, on religious grounds or otherwise'"). But the majority reasons that our

legislature, in providing for a religious exemption from immunization requirements for

children attending day care, has necessarily determined that Arizona has no compelling state

interest in immunizing dependent children that would override a parent's religious objection.

*See* ¶¶ 23-25, *supra*.[12] *See Prince*, 321 U.S. at 166-67, 64 S. Ct. at 442-43. This reasoning

---

[12]Although the majority cites § 36-883(C) as authority for this legislative determination, ¶ 25, *supra*, this statute does not actually provide such an exemption but addresses the rule-making authority of ADHS as discussed in ¶ 59, *infra*.

33

is infirm because it draws together and conflates completely unrelated statutes to arrive at a conclusion supported by none.

¶55 As an initial observation, the majority relies on a negative inference that the legislature's choice to provide a religious exemption from immunization for the general population of children is an affirmative expression that it has no compelling interest, and therefore no authority, to have chosen a different course for dependent children. But certainly there are other areas in which the legislature could regulate but declines to, not because the state lacks sufficient interest to justify intervention, but simply as a matter of practical priorities or inclination. As acknowledged by the majority, the religious exemption from immunization permitted by § 36-883 is merely a matter of legislative grace; it should not therefore be elevated to a constitutional shackle on a juvenile court's determining the medical needs of a dependent child.

¶56 Equally problematic is the majority's implicit requirement that the provisions in Title 8 governing the care of dependent children be read *in pari materia* with those public health and education statutes, essentially a mixing of apples and oranges. It is well established that "[s]tatutory provisions are to be read in the context of related provisions and of the overall statutory scheme," and "[s]tatutes relating to the same subject matter should be read *in pari materia* to determine legislative intent and to maintain harmony." *Goulder v. Ariz. Dep't of Transp.*, 177 Ariz. 414, 416, 868 P.2d 997, 999 (App. 1993), *aff'd*, 179 Ariz. 181, 877 P.2d 280 (1994). But that is not the situation here. Although many of the public

health, education, and dependency statutes cited in this case refer to immunizations, they do not share the same statutory scheme. Instead, they "were enacted at different times to protect different interests." *Employers Mut. Cas. Co. v. McKeon*, 159 Ariz. 111, 114, 765 P.2d 513, 516 (1988) (statutes regarding uninsured and underinsured insurance coverages not to be read *in pari materia* with statutes addressing liability coverage).

**¶57**     Because Cheyenne has been adjudicated dependent, the proper point of reference must be those statutes specifically addressing the care of dependent children in the legal custody of ADES and the juvenile court's authority to make custodial decisions for those children in accordance with statutory guidelines. *See In re Pima County Juvenile Action No. J-78632*, 147 Ariz. 584, 587, 712 P.2d 431, 434 (1986) (legislature "intended that [ADES] have power to act for the benefit of a dependent child subject to juvenile court review"); *see also*, *e.g.*, A.R.S. §§ 8-201(13) (definition of "dependent child"); 8-202 ("[j]urisdiction of juvenile court"); 8-512 ("[c]omprehensive medical and dental care; guidelines"); 8-514.05(c) (foster parent may consent to routine medical procedures); 8-845(B) ("[d]isposition hearing"; considerations for review of child's status).

**¶58**     Section 8-512, located in Chapter 5 ("Child Welfare and Placement") of Title 8 ("Children"), requires ADES to provide comprehensive medical care to a child in its legal custody as prescribed by rules of the Department. Such care expressly includes regular immunizations. First, § 8-512(B) provides for certain immunizations to be included in medical care "as minimums." *Id.* In addition, Department rules specify "a complete

preplacement medical examination . . . [that] shall include as a minimum" specified vaccinations "if not previously provided to the foster child" and also provide for the inclusion of "immunizations" in its "Comprehensive Medical/Dental Program for Foster Children." Ariz. Admin. Code R6-5-6005(A)(1), (11). The goal of the ADES medical program "is to provide . . . full coverage for those medical and dental services which are necessary to the achievement and maintenance of an optimal level of physical and mental health for children in foster care." Ariz. Admin. Code R6-5-6001. The clear purpose of § 8-512 is to provide for the medical needs of children who become legally dependent upon the state for that care.

¶59 In contrast, § 36-883, found in Chapter 7.1 ("Child Care Programs") of Title 36 ("Public Health and Safety"), authorizes ADHS to promulgate rules "regarding the health, safety and well-being of the children to be cared for in a child care facility," with the caveat that any rule related to educational activities, physical examination, medical treatment or immunization "shall include appropriate exemptions" for children whose parents object on the ground of religious belief. The statute does not pertain to the care of dependent children. Instead, by its terms, the statute speaks to public health concerns about *all* children enrolled in day care.

¶60 Similarly, Article 6 ("School Immunization") of Chapter 8 ("School Attendance") in Title 15 ("Education") does not address the state's care of dependent children but deals only with general public health concerns. Section 15-872, A.R.S., requires that "a pupil shall not be allowed to attend school without submitting documentary proof"

36

that he or she has been immunized in accordance with rules promulgated by ADHS in accordance with § 36-672. Section 15-873 permits a parent or guardian to exempt his or her child from these immunization requirements by submitting a signed statement that the parent or guardian has received information about immunizations from ADHS, understands its risks and benefits and the potential risks of nonimmunization, and does not consent to the immunizations due to personal beliefs. § 15-873(A)(1). However, a child who has been exempted from immunization must be excluded from school "during outbreak periods of communicable immunization-preventable diseases as determined by the department of health services or local health department." § 15-873(C); *see also Maricopa County Health Dep't v. Harmon*, 156 Ariz. 161, 166-67, 750 P.2d 1364, 1369-70 (App. 1987) (neither right to education nor right to free expression of religion violated by county health department order excluding nonimmunized children from school attendance after measles outbreak in community). Other related statutes also attest to the public health nature of the legislature's interest in immunizing school children. *See, e.g.*, A.R.S. § 36-673 (permitting local health departments to provide no-cost school immunizations and train school nurses to administer them); A.R.S. § 36-697(B)(3) (ADHS "health start program" goals include "increas[ing] the number of children receiving age appropriate immunizations by two years of age").

¶61 There is no reason to believe the legislature intended these public health statutes pertaining to immunization of children attending child-care facilities and schools to be read together with provisions in Title 8 regarding the care of dependent children, so that

37

an unfit parent could prohibit the child's immunization on religious grounds. Section 8-512 unambiguously grants ADES authority to immunize children in its legal custody, and any challenged decision by ADES as custodian is subject to the juvenile court's independent determination of the child's best interests. *See Maricopa County No. J-6236*, 178 Ariz. at 451-52, 874 P.2d at 1008-09. No statutory ambiguity calls for further interpretation.

¶62 Moreover, there is no conflict between the provisions in § 8-512 authorizing immunization of a dependent child and the public health statutes and regulations cited by the majority. Those provisions recognize the right of a custodian acting *in loco parentis*, as ADES is here, either to authorize immunizations or request an exemption. *See* A.R.S. §§ 15-101(15) ("'[p]arent' means the natural or adoptive parent of a child or a person who has custody of a child"); 15-101(16) ("'[p]erson who has custody' means a parent or legal guardian of a child, a person to whom custody of the child has been given by order of a court or a person who stands in loco parentis to the child"); 36-673 (informed consent for school immunizations by "person in loco parentis"); Ariz. Admin. Code R9-6-706(F) ("responsible person" may submit statement of exemption from immunization to child-care facility); Ariz. Admin. Code R9-6-701(42) ("'[r]esponsible person' has the same meaning as 'parent' in R9-5-101"); Ariz. Admin. Code R9-5-101(79) ("[p]arent" includes "[a] natural or adoptive mother or father," "[a] legal guardian appointed by a court of competent jurisdiction," or "[a] 'custodian' as defined in A.R.S. § 8-201"). Perhaps more to the point in this case, there is no conflict, constitutional or otherwise, in the legislature's deferring to a *fit parent*'s

decisions as a matter of public health laws but, in the case of a dependent child whose parent has been deemed unfit, deferring instead to the jurisdiction of the juvenile court.

¶63    In short, there exists no statutory conflict or ambiguity with respect to the construction of § 8-512. That being so, "application of the *in pari materia* doctrine to two statutes enacted at different times to deal with different problems, brings more confusion than enlightenment." *McKeon*, 159 Ariz. at 114, 765 P.2d at 516. The majority therefore errs in reading § 8-512 as limited by public health statutes that govern fit, custodial parents' enrollment of their children in a child-care facility or school.

¶64    Finally, although the majority repeatedly refers to the "residual rights" language in § 8-531(5)(c) and concludes Diana's ability to "direct the religious upbringing of her child"—even at the expense of the child's medical needs—has been "expressly preserved by statute," ¶ 38, *supra*, that assertion can only be true if this court rewrites the statute. Nowhere in § 8-531 is religion ever mentioned and, for the reasons outlined above, there is no factual or legal basis for believing the legislature intended such an unstated contradiction to the direct mandate of § 8-512 that dependent children in the state's custody receive comprehensive medical care, including immunizations. Thus, contrary to the majority's assertions, the state has not expressly "subordinated its interest in the particular medical procedure [for a dependent child] to the rights of the parent." ¶ 39, *supra*. Furthermore, even if determining a child's "religious affiliation" is a right that properly remains with the parent of a dependent child, as the state at oral argument acknowledged it

39

"honors" as a matter of practice, Diana has not demonstrated, or even suggested, notwithstanding her religious convictions, that immunizing Cheyenne would prevent or interfere with raising her in the religion of Diana's choice. *Cf. Yoder*, 406 U.S. at 218, 92 S. Ct. at 1534 (Amish parent demonstrated compulsory secondary education would "substantially interfer[e] with the religious development of the Amish child and his integration into the way of life of the Amish faith community at the crucial adolescent stage of development").

**Conclusion**

¶65      I believe the majority's decision displaces the legislature's clear mandate that a juvenile court provide for a dependent child's care in accordance with the child's best interests, *see Cochise County No. 5666-J*, 133 Ariz. at 161, 650 P.2d at 463, treating the health and safety of a child as a paramount concern, § 8-845(B).  Under the majority's approach, if a parent raises a religious objection to a dependent child's receiving medical care, the welfare of the child ceases to be the governing standard for the juvenile court.[13] Instead, ADES must establish that the health benefits from a particular procedure give rise to a "compelling state interest" before a court may authorize the proposed care—even when Title 8 expressly includes the procedure at issue as part of the comprehensive medical care

---

[13]Equally troubling, under today's decision, the ability of an unfit parent to control decisions for his or her dependent child is not necessarily limited to health care.  For example, a parent of a seven-year-old dependent child could insist, based on a religious objection to a school's curriculum or to formal education itself, that ther child be home-schooled, or not instructed at all, given the statute that permits a parent to opt out of public education until the child is eight years of age.  A.R.S. § 15-802.

ADES must provide to dependent children. *See* § 8-512. This result is not only inconsistent with legislative intent but offends the state's public policy of protecting and providing for its most helpless citizens—dependent children, whose parents are unable or unwilling to do so.

**¶66** I respectfully dissent.

_____
PHILIP G. ESPINOSA, Judge