******************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.
******************************************

ROGERS, C. J., with whom EVELEIGH, J., joins, concurring. I agree and join with the majority's holding that General Statutes § 17a-10 (c)[1] does not authorize the Department of Children and Families (department), to vaccinate children in the temporary custody of the petitioner, the Commissioner of Children and Families (commissioner), over the religious objection of the respondent parents, Giordan T. and Nicanol T. I write separately in order to more fully address the commissioner's claim that, as the guardian of children committed to her temporary custody pursuant to General Statutes § 46b-129 (j) (4),[2] she has all of the rights and obligations of a guardian as set forth in General Statutes § 17a-1 (12),[3] including the right to authorize the vaccination of such children. In support of this contention, the commissioner points out that, on August 23, 2016, the trial court issued a form order stating that "[t]he child or youth is committed until further order of the court to the Commissioner of Children and Families who shall be the guardian of the child or youth according to the statutes in such cases."

The genealogy and legislative history of the relevant statutes, however, do not support the claim that the commissioner is the exclusive guardian of children who are temporarily committed to her custody, with all of the rights and obligations set forth in § 17a-1 (12). In 1971, the predecessor to § 46b-129 (j) (4) provided that the "welfare commissioner" was the guardian of a child who was committed to his custody. See General Statutes (Supp. 1969) § 17-62 (d). Notwithstanding this provision and the fact that certain children were committed to both the Welfare Commissioner and the Commissioner of Children and Youth Services, at some point in 1970 or 1971, the Attorney General wrote an opinion indicating that the Commissioner of Children and Youth Services could not authorize medical treatment for children in his custody because he was only their custodian.[4] See Conn. Joint Standing Committee Hearings, Corrections, Welfare and Humane Institutions, 1971 Sess., Pt. 1, p. 185–86, remarks of John Dorman, Special Assistant to the Commissioner of Children and Youth Services (referencing "dual commitments" where child is committed to the Department of Welfare and Commissioner of Children and Youth Services, and noting recent opinion of Attorney General that state cannot authorize medical treatment for children in its custody because it has "mere custody of the child and not guardianship"); 14 H.R. Proc., Pt. 5a, 1971 Sess., p. 2201, remarks of Representative John F. Papandrea ("[This bill] provides that the Commissioner of Children and Youth Services shall be empowered and authorized to have emergency medical treatment given to any ward placed in his custody . . . . This presently is not possi-

ble and the Attorney General last year was forced to give a ruling indicating that the commissioner had no power even in the face of an emergency."). Because these agencies lacked authority to authorize medical treatment for children in their custody, the legislature enacted No. 295 of the 1971 Public Acts, enabling the Commissioner of Children and Youth Services to authorize medical treatment for children in his custody. See General Statutes (Supp. 1971) § 17-418 (c). Notably, however, neither the original version of § 17a-10 (c), which referred to the Commissioner of Children and Youth Services; see Public Acts 1971, No. 295, § 1; nor the current version, which refers to the commissioner; see Public Acts 1993, No. 93-91 (amending § 17a-10 [c] to substitute "Commissioner of Children and Families" for "Commissioner of Children and Youth Services"); expressly provides that the agency to which a neglected or abused child is committed, or the commissioner of that agency, is the child's guardian. Moreover, as the majority opinion points out, the legislative history of § 17a-10 (c) indicates that it was intended only to grant the Commissioner of Children and Youth Services the authority to authorize medical treatment in emergency situations when that commissioner could not obtain the consent of the parents. See 14 H.R. Proc., supra, p. 2201. Accordingly, the statute cannot reasonably be interpreted as giving the agency to which a child is temporarily committed all of the broad rights of a guardian with respect to the medical treatment of a child.[5]

It follows, therefore, that § 17a-1 (12), which was enacted in 1998; see Public Acts 1998, No. 98-241; also cannot be interpreted as giving the commissioner all of the rights of a guardian. First, as I have just explained, the enactment of Public Act 1971, No. 295, in 1971 was premised on the legislature's understanding that the state agency having temporary custody of neglected or abused children was *not* the guardian of those children for all purposes, notwithstanding the fact that General Statutes (Supp. 1969) § 17-62 (d) provided that the Welfare Commissioner was the guardian of a child also committed to the custody of the Commissioner of Children and Youth Services. I am aware of no intervening law that broadened the guardianship rights of those commissioners. A statute, such as § 17a-1 (12), that *defines* guardianship rights and obligations does not, ipso facto, *confer* guardianship rights and obligations on any particular person or entity.

Second, by its plain terms, § 17a-1 (12) applies to "a person who has a judicially created relationship between a child or youth and such person that is intended to be *permanent and self-sustaining* . . . ." (Emphasis added.) This is not the case when the commissioner has only temporary custody of a child and the parents' rights have not yet been terminated. Third, the legislative history of § 17a-1 (12) provides no support for the proposition that it was intended to give

the commissioner exclusive guardianship rights over children in her temporary custody.[6]

Thus, the legislative genealogy and history of the relevant statutory scheme support the conclusion that, when the legislature enacted the predecessor to § 17a-10 (c) in 1971 it contemplated that the Commissioner of Children and Youth Services had, at most, a form of joint guardianship with the parents of a child who had been temporarily committed to him, and the rights of the parents had not been terminated. The legislature did not intend to confer the exclusive and unfettered authority to authorize any and all forms of medical treatment, provided only that such treatment was in the child's best interest. Moreover, the enactment of § 17a-1 (12) in 1998 did not expand the commissioner's rights as a coguardian of children in her temporary custody. Indeed, the department's own guidelines provide that "[t]he Area Office Social Work or Juvenile Justice staff shall refer a case to the Medical Review Board when . . . the treatment may be contrary to the wishes of a parent or legal guardian . . . ." Department of Children and Families, "Practice Guide: Standards and Practice Regarding the Health Care of Children in [the Department of Children and Families'] Care" (2014), p. 22. Those guidelines also provide that the staff member who refers a case to the Medical Review Board "shall work with the [Regional Resource Group] Nurse or Nurse Practitioner to make personal contact with the parents . . . and the parents' . . . attorneys . . . to ensure that they each understand the medical plan, understand the risks and benefits, are in agreement with it, and consent." Id., p. 23. Thus, the department clearly is operating under the assumption that parents continue to have an important role in making medical decisions for their children even when they have temporarily lost custody of them.[7] This interpretation is also consistent with the important constitutional rights at issue, namely, the parents' substantive due process right to raise their children as they see fit, including the right to control the children's religious upbringing. See *Santosky* v. *Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the [s]tate. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life."); see also *State* v. *DeCiccio*, 315 Conn. 79, 149, 105 A.3d 165 (2014) ("[i]t is well established that this court has a duty to construe statutes, whenever possible, to avoid constitutional infirmities" [internal quotation marks omitted]).

Accordingly, it is reasonable to conclude that § 17a-10 (c) was intended to apply only when the commissioner has a compelling reason to seek immediate medi-

cal treatment for a child in her temporary custody and there may be insufficient time to obtain the consent of the parents, i.e., in medical emergencies. When immediate medical treatment is not required to ensure the good health of the child the statute does not apply, and, in the absence of any other express statutory source to authorize medical services or treatment for the child, the commissioner must attempt to obtain the consent of the parents as the child's coguardians. If the parents cannot be found, I would conclude that the commissioner must make that representation to a court and seek to obtain an order allowing the commissioner to authorize medical treatment. Similarly, the commissioner must obtain a court order if the parents object to the medical treatment.[8]

With respect to the legal standard to be applied in cases in which the commissioner is seeking a court order authorizing the medical treatment of a child in its temporary custody over the objection of the parents, my research has revealed no Connecticut case that address this issue, or the issue of when a court may order medical treatment for a child in the parents' custody over the objection of the parents. *In the Matter of McCauley*, 409 Mass. 134, 136–37, 139, 565 N.E.2d 411 (1991), the Supreme Judicial Court of Massachusetts addressed the latter question and concluded that the rights of parents to make decisions for their children, the child's interest in continuing good health and the state's parens patriae interest must be balanced.[9] I believe that this is an appropriate standard, and I would apply it even when the parents have lost temporary custody of their children to the commissioner.

With respect to the narrow question of whether the commissioner may authorize the vaccination of a child in her temporary custody over the religious objection of the child's parents, the Connecticut legislature has already concluded as a matter of public policy that the interest of parents in opting not to vaccinate their children on religious grounds outweighs the child's interest in being immune from certain diseases and the state's parens patriae interest in ensuring the well-being of the child and the public at large. See General Statutes § 10-204a.[10] In my view, the courts are bound by this policy determination. Accordingly, I would conclude in the present case that the commissioner had no authority either under § 17a-10 (c) or as the coguardian of the children in her temporary custody to authorize their vaccination over the parents' religious objection.

[1] General Statutes § 17a-10 (c) provides: "When deemed in the best interests of a child in the custody of the [Commissioner of Children and Families], the commissioner, the commissioner's designee, a superintendent or assistant superintendent or, when the child is in transit between [Department of Children and Families] facilities, a designee of the commissioner, may authorize, on the advice of a physician licensed to practice in the state, medical treatment, including surgery, to insure the continued good health or life of the child. Any of said persons may, when he or she deems it in the best interests of the child, authorize, on the advice of a dentist licensed to practice in the state, dentistry, including dental surgery, to insure the

continued good health of the child. Upon such authorization, the commissioner shall exercise due diligence to inform the parents or guardian prior to taking such action, and in all cases shall send notice to the parents or guardian by letter to their last-known address informing them of the actions taken, of their necessity and of the outcome, but in a case where the commissioner fails to notify, such failure will not affect the validity of the authorization.”

[2] General Statutes § 46b-129 (j) (4) provides in relevant part: “The commissioner shall be the guardian of [a] child [committed to the custody of the commissioner] for the duration of the commitment . . . .”

[3] General Statutes § 17a-1 (12) (B) defines “ ‘guardian’ ” in relevant part as “a person who has a judicially created relationship between a child or youth and such person that is intended to be permanent and self-sustaining as evidenced by the transfer to such person of the following parental rights with respect to the child or youth . . . the authority to make major decisions affecting the child's or youth's welfare, including, but not limited to . . . major medical, psychiatric or surgical treatment . . . .”

The commissioner contends that, because she is the guardian of children in her temporary custody, she has the authority under General Statutes § 10-204a (a) to determine whether to invoke the exemption to the immunization requirement when immunization would be contrary to the religious beliefs of such children. See General Statutes § 10-204a (a) (3) (exempting from immunization requirement “[a]ny such child who . . . presents a statement from the parents or guardian of such child that such immunization would be contrary to the religious beliefs of such child . . . shall be exempt from the appropriate provisions of this section”). If § 17a-1 (12) confers this authority, however, it necessarily confers the authority to make *all* decisions concerning the welfare of such children, including the authority to authorize vaccinations in the first instance. Thus, the commissioner effectively contends that the authority conferred on it by § 17a-10 (c) is superfluous to its authority as the guardian of children in its temporary custody.

[4] This opinion is not available in the Connecticut State Library. Accordingly, it is unclear to which state entity—the Welfare Commissioner or the Department of Children and Youth Services—the opinion was directed. As I discuss later in this concurring opinion, however, the legislature responded to the Attorney General's opinion by authorizing the Commissioner of Children and Youth Services to authorize medical services for children in his custody. Accordingly, it is reasonable to conclude that the opinion was directed at that commissioner.

[5] Although General Statutes (Supp. 1969) § 17-62 (d) provided that the Welfare Commissioner was the guardian of children committed to his custody, and No. 295 of the 1971 Public Acts was directed at the Commissioner of Children and Youth Services, it is clear that the Welfare Commissioner did not have all of the rights and obligations of a guardian. If he had, then he could simply have authorized the Commissioner of Children and Youth Services to provide medical treatment to children in his temporary custody.

[6] Section 17a-1 (12) was enacted in response to Congress' enactment of the Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, 111 Stat. 2115 (1997) (ASFA). See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 7, 1998 Sess., p. 2175, written testimony of Kristine D. Ragaglia, Commissioner of the Department of Children and Families (explaining that § 17a-1 [12] was intended to address AFSA requirement that states define guardian). Section 101 (b) of the AFSA, codified at 42 U.S.C. § 675 (7) (2012), defines “legal guardianship” as “a judicially created relationship between child and caretaker which is intended to be permanent and self-sustaining as evidenced by the transfer to the caretaker of the following parental rights with respect to the child: protection, education, care and control of the person, custody of the person, and decisionmaking.” (Internal quotation marks omitted.) Title 42 of the United States Code, § 675 (2), provides: “The term ‘parents’ means biological or adoptive parents or legal guardians, *as determined by applicable State law*.” (Emphasis added.) When the ASFA was enacted in 1997, however, Connecticut's laws governing commitment of a child and termination of parental rights did not define “legal guardian.” Accordingly, to address this gap, the legislature enacted § 17a-1 (12), apparently taking the language “permanent and self-sustaining as evidenced by the transfer . . . of the following parental rights” from the federal statute, and the enumerated rights and obligations from General Statutes § 45a-604 (5); see Public Acts 1973, No. 156; that defines “guardianship” for probate purposes. The legislative history of No. 98-241 of the 1998 Public Acts, which, in addition to enacting § 17a-1 (12), made numerous changes to the statutes

governing commitment to the commissioner and termination of parental rights, indicates that the general purpose of the legislation was to shorten the period in which children committed to the commissioner are in limbo. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 6, 1998 Sess., p. 1856, remarks of Attorney General Richard Blumenthal ("this bill essentially aims to move [decisions regarding the disposition of abused and neglected children] more quickly . . . [and] [t]he thrust of this measure is to provide for adoptive homes as soon as possible so that they can be secure, permanent [and] stable, where reunification is not a realistic hope"). I see *no* evidence that the purpose of § 17a-1 (12) was to make the commissioner the exclusive guardian of children in her temporary custody.

[7] I emphasize that my sole focus in this concurring opinion is on the right of the commissioner to make medical decisions for children in her temporary custody when the rights of the parents have not been terminated. I express no opinion on the rights or obligations of the commissioner to care for children in her temporary custody in other contexts.

[8] Of course, as a matter of common sense, the commissioner may also authorize medical treatment for children in her temporary custody with respect to the minor scrapes and bruises that are an everyday occurrence during childhood without obtaining the consent of the parents or a court order. I need not, however, determine the outer limits of that authority here.

[9] The court stated in *McCauley*: "We are faced with the difficult issue of when a [s]tate may order medical treatment for a dangerously ill child over the religious objections of the parents. . . . [T]here are three interests involved: (1) the natural rights of parents; (2) the interests of the child; and (3) the interests of the [s]tate. . . .

"Courts have recognized that the relationship between parents and their children is constitutionally protected, and, therefore, that the private realm of family life must be protected from unwarranted [s]tate interference. . . . The rights to conceive and to raise one's children are essential . . . basic civil rights . . . . The interest of parents in their relationship with their children has been deemed fundamental, and is constitutionally protected. . . . Parents, however, do not have unlimited rights to make decisions for their children. Parental rights do not clothe parents with life and death authority over their children. . . . The [s]tate, acting as parens patriae, may protect the well-being of children. . . .

"The right to the free exercise of religion, including the interests of parents in the religious upbringing of their children is, of course, a fundamental right protected by the [federal] Constitution. . . . However, these fundamental principles do not warrant the view that parents have an absolute right to refuse medical treatment for their children on religious grounds. . . .

"The [s]tate's interest in protecting the well-being of children is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. . . . The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. . . . [T]he power of the parent, even when linked to a free exercise claim, may be subject to limitation . . . if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens. . . . When a child's life is at issue, it is not the rights of the parents that are chiefly to be considered. The first and paramount duty is to consult the welfare of the child." (Citations omitted; footnote added; internal quotation marks omitted.) *In the Matter of McCauley*, supra, 409 Mass. 136–37; see also *Diana H.* v. *Rubin*, 217 Ariz. 131, 136, 171 P.3d 200 (App. 2007) (under federal constitutional due process principles, when parents object to vaccination of child in temporary custody of state, "state must demonstrate a compelling interest to justify overriding the combination of religious and parental rights involved"); *In re G.K*, 993 A.2d 558, 566 (D.C. App. 2010) (under statute defining "residual parental rights," parents retained right to consent to certain medical treatment for child in legal custody of state); *In the Mattter of Lyle A.*, 14 Misc. 3d 842, 850, 830 N.Y.S.2d 486 (2006) (implicit in routine procedures used by Department of Human Services was that "[a] parent whose child is in foster care has the right to make the decision regarding whether or not his or her child will be given psychotropic drugs"); *In the Matter of Martin F.*, 13 Misc. 3d 659, 676, 820 N.Y.S.2d 759 (2006) (if parent of child in temporary foster care opposes administration of mental health medicine it cannot lawfully be prescribed unless court determines "whether the proposed treatment by medication is narrowly tailored to give substantive effect to the [child] patient's liberty interest"); *Guardianship of Stein*, 105 Ohio St. 3d 30, 35–36, 821 N.E.2d 1008 (2004) ("the decision

to withdraw life-supporting treatments goes beyond the scope of making medical decisions," and, therefore, "[t]he right to withdraw life-supporting treatment for a child remains with the child's parents until the parents' rights are permanently terminated"); but see *In re Deng*, 314 Mich. App. 615, 626–27, 887 N.W.2d 445 (because determination of unfitness "so breaks the mutual due process liberty interests as to justify interference with the parent-child relationship," state could vaccinate children in temporary custody over objection of parents pursuant to statute allowing parents to opt out based on religious objections [internal quotation marks omitted]), appeal denied, 500 Mich. 860, 884 N.W.2d 580 (2016).

[10] See footnote 3 of this concurring opinion for the relevant text of § 10-204a.

––––––––––––––––––