******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

ROBINSON, C. J., concurring. I agree with and join the majority opinion, in which the majority upholds the trial court's grant of summary judgment on governmental immunity grounds in favor of the defendants, the town of Seymour and three of its municipal police officers,[1] in this action claiming that two of the police officers acted negligently when they briefly pursued a Ford Mustang convertible in which Brandon Giordano, the decedent of the plaintiff, Angela Borelli, was a passenger. I write separately to explain my views about the significant issues of municipal law considered in the majority and dissenting opinions in this appeal. First, I agree with the dissent's conclusion that General Statutes § 14-283 (d),[2] which imposes on the operators of emergency vehicles certain obligations, including a "duty to drive with due regard," functions as an exception to governmental immunity for discretionary acts pursuant to General Statutes § 52-557n (a) (2) (B).[3] I also conclude, however, that a police officer's decision to pursue a fleeing law violator is a discretionary act not within the contemplation of this exception because it does not constitute "driv[ing]" under § 14-283 (d). Second, although the dissent's doctrinal and historical observations about this court's limited application of the identifiable person, imminent harm exception to discretionary act immunity are well taken, substantial public policy reasons support the majority's conclusion that the decedent, who was a passenger in a vehicle fleeing from the police during a pursuit, was not an identifiable person subject to imminent harm. Accordingly, I join the majority opinion affirming the judgment of the trial court.

## I

I begin with whether a police officer's decision to engage in a pursuit is a discretionary act subject to governmental immunity under § 52-557n (a) (2) (B), which provides: "*Except as otherwise provided by law*, a political subdivision of the state shall not be liable for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." (Emphasis added.) This statute codifies the well established common-law principles governing governmental immunity for discretionary acts and extends those principles from municipal employees to the municipality itself. See, e.g., *Northrup* v. *Witkowski*, 332 Conn. 158, 167, 210 A.3d 29 (2019); *Edgerton* v. *Clinton*, 311 Conn. 217, 229 n.12, 86 A.3d 437 (2014). "Generally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts. . . . Governmental

acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. . . . The hallmark of a discretionary act is that it requires the exercise of judgment. . . . In contrast, [m]inisterial refers to a duty [that] is to be performed in a prescribed manner without the exercise of judgment or discretion. . . .

* * *

"Municipal officials are immunized from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society. . . . Discretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury. . . . In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion. . . . This is because society has no analogous interest in permitting municipal officers to exercise judgment in the performance of ministerial acts. . . .

"This court has identified two other policy rationales for immunizing municipalities and their officials from tort liability. The first rationale is grounded in the principle that for courts to second-guess municipal policy making by imposing tort liability would be to take the administration of municipal affairs out of the hands to which it has been entrusted by law. . . . Second, we have recognized that a civil trial may be an inappropriate forum for testing the wisdom of legislative actions. This is particularly true if there is no readily ascertainable standard by which the action of the government servant may be measured . . . . Thus, [t]he policy behind the exception is to avoid allowing tort actions to be used as a monkey wrench in the machinery of government decision making. . . .

"For purposes of determining whether a duty is discretionary or ministerial, this court has recognized that [t]here is a difference between laws that impose general duties on officials and those that mandate a particular response to specific conditions. . . . A ministerial act is one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment [or discretion] upon the propriety of the act being done. . . . In contrast, when an official has a general duty to perform a certain act, but there is no city charter provision, ordinance, regulation, rule, policy, or any other directive [requiring the government

official to act in a] prescribed manner, the duty is deemed discretionary." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Northrup* v. *Witkowski*, supra, 332 Conn. 167–70.

As the majority aptly notes, "[i]t is firmly established that the operation of a police department is a governmental function, and that acts or omissions in connection therewith ordinarily do not give rise to liability on the part of the municipality. . . . Indeed, this court has long recognized that it is not in the public's interest to [allow] a jury of laymen with the benefit of 20/20 hindsight to second-guess the exercise of a [police officer's] discretionary professional duty. Such discretion is no discretion at all. . . . Thus, as a general rule, [p]olice officers are protected by discretionary act immunity when they perform the typical functions of a police officer." (Citation omitted; internal quotation marks omitted.) Part I of the majority opinion, quoting *Ventura* v. *East Haven*, 330 Conn. 613, 630–31, 199 A.3d 1 (2019), and *Gordon* v. *Bridgeport Housing Authority*, 208 Conn. 161, 180, 544 A.2d 1185 (1988); see, e.g., *Coley* v. *Hartford*, 312 Conn. 150, 164–65, 95 A.3d 480 (2014) (noting, with respect to officer's "alleged failure to adhere to specific police response procedures . . . the considerable discretion inherent in law enforcement's response to an infinite array of situations implicating public safety on a daily basis"), overruled in part on other grounds by *Ventura* v. *East Haven*, 330 Conn. 613, 199 A.3d 1 (2019); *Shore* v. *Stonington*, 187 Conn. 147, 153–55, 444 A.2d 1379 (1982) (whether to detain suspected drunk driver was discretionary act).

It is well settled, however, that exceptions to discretionary act immunity under § 52-557n (a) (2) (B) may be furnished by state or federal statutory law, as well as the common law. See, e.g., *Grady* v. *Somers*, 294 Conn. 324, 344–46, 984 A.2d 684 (2009) (reviewing legislative history of § 52-557n in concluding that phrase "except as provided by law" in subsection (a) (2) (B) encompasses identifiable person, imminent harm exception to discretionary act immunity at common law). Thus, whether § 14-283 and the common-law principles governing the operation of emergency vehicles furnish an exception to discretionary act immunity under § 52-557n (a) (2) (B) presents a question of statutory interpretation, under General Statutes § 1-2z, over which our review is plenary. See, e.g., *Ventura* v. *East Haven*, supra, 330 Conn. 631–32, 634; *Grady* v. *Somers*, supra, 332–33.

In my view, part II of the dissenting opinion makes compelling arguments in support of the proposition that driving is subject to a standing common-law exception to discretionary act immunity under § 52-557n (a) (2) (B). This includes driving an emergency vehicle in accordance with the privileges and responsibilities set forth by § 14-283 (d), which codifies the reasonable care

standard articulated by this court in *Voltz* v. *Orange Volunteer Fire Assn., Inc.*, 118 Conn. 307, 311, 172 A. 220 (1934), and *Tefft* v. *New York, New Haven & Hartford Railroad Co.*, 116 Conn. 127, 134, 163 A. 762 (1933).[4] I part company from the dissent, however, because I conclude that the exception does not extend to the decision to engage in a pursuit[5] and, instead, agree with the majority's conclusion that the exception is limited to the manner in which the officer conducts the pursuit.[6]

Pursuant to § 1-2z, I begin with the statutory text. First, § 14-283 (d), which prescribes the duty of care, is limited to "the duty to *drive* with due regard for the safety of all persons and property." (Emphasis added.) The ordinary meaning of the word "drive" is "to operate the mechanism and controls and direct the course of (as a vehicle) . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2011) p. 381; see, e.g., *In re Elianah T.-T.*, 326 Conn. 614, 622, 165 A.3d 1236 (2017) (noting that, pursuant to General Statutes § 1-1 (a), ordinary meaning of word is determined by reference to dictionary definitions). This limited definition does not encompass the initial decision to engage in emergency operation, as envisioned under § 14-283 (a), which defines "emergency vehicle," in relevant part, as "any state or local police vehicle operated by a police officer . . . answering an emergency call or in the pursuit of fleeing law violators . . . ." That initial decision to escalate from ordinary to emergency operation under subsection (a) of § 14-283 is what gives rise to the various operating privileges and responsibilities available under subsections (b), (c) and (d), including the right to disregard the rules of the road, such as speed limits or stopping at red lights, when using lights and sirens and driving with "due regard for the safety of all persons and property."[7] General Statutes § 14-283 (d); see *State* v. *Gurich*, 238 P.3d 1, 9–10 (Okla. 2010) (Reif, J., dissenting) (analyzing text of Oklahoma's uniform emergency vehicle statute and concluding that it does not govern decision to pursue). That having been said, I believe that the dissent's reading of the statute to include the decision to pursue, which is consistent with that of two of our sister states; see *Robbins* v. *Wichita*, 285 Kan. 455, 465–66, 172 P.3d 1187 (2007); *State* v. *Gurich*, supra, 7–8; is reasonable, rendering the statute ambiguous for purposes of the § 1-2z analysis. Accordingly, I turn to extratextual sources and existing case law.

I begin with this court's decision in *Tetro* v. *Stratford*, 189 Conn. 601, 458 A.2d 5 (1983), the import of which presents a point of strong disagreement between the majority and the dissent. I review *Tetro* in detail because I agree with the dissent that it would be dispositive, if it is in fact on point.[8] In *Tetro*, two Stratford police officers observed a green Chevrolet in a shopping center parking lot that they thought might have been stolen because it was occupied by several boys who "looked

too young to have valid drivers' licenses," and, "[w]hen the police approached the Chevrolet to make inquiries, the boys drove off." Id., 602–603. The officers pursued the Chevrolet at high speeds through a densely populated urban area, proceeding the wrong way up a one-way street, leading to a head-on collision with the Chevrolet and the vehicle driven by the plaintiff, Joseph Tetro. Id., 603. Tetro brought an action against the two individual officers and the town of Stratford (collectively, Stratford defendants). Id., 602. This court observed that the Stratford defendants did "not directly challenge [on appeal] the propriety of the jury's conclusion that [the officers'] conduct was negligent" but "claim[ed] instead that the evidence was insufficient, for three reasons, to establish the necessary causal link between their acts or omissions and the injuries sustained by [Tetro]. They argue[d] that proximate cause was lacking because of: (1) the intervening negligence of the driver of the pursued car; (2) the lack of connection between [Tetro's] injuries and the [officers'] operation of the police car; and (3) the immunity conferred, as a matter of public policy, upon emergency vehicles in pursuit of law violators. Therefore, the [Stratford] defendants maintain[ed], the court was required to resolve the issue of proximate cause in their favor as a matter of law." Id., 604.

The court first rejected the common-law causation arguments before concluding that § 14-283 did not supplant the common-law principles of proximate causation with respect to emergency vehicles. Id., 607–608. The court disagreed with the Stratford defendants' argument that § 14-283 "limits [the officers'] scope of duty to incidents involving collisions with the emergency vehicle itself," declining to "read the words 'safety of all persons and property' [in § 14-283 (d)] so restrictively." Id., 609. The court noted that "[o]ther courts, construing similar statutory language, have explained that emergency vehicle legislation provides only limited shelter from liability for negligence. The effect of the statute is merely to displace the conclusive presumption of negligence that ordinarily arises from the violation of traffic rules. The statute does not relieve operators of emergency vehicles from their general duty to exercise due care for the safety of others." Id. Thus, the court concluded that "§ 14-283 provides no special zone of limited liability once the [municipal] defendants' negligence has been established." Id., 610.

The Stratford defendants' third and final claim in *Tetro* was that "public policy requires a limitation of the liability of pursuing police vehicles to accidents involving the police car itself. [They] maintain[ed] that police officers should not have to abandon or terminate the pursuit of law violators just because the fleeing person may create a risk to the public." Id. The court followed the general verdict rule in declining to consider this argument, observing that the argument con-

cerned "principally one aspect of the [officers'] alleged failure to exercise due care, *namely the failure to abandon or terminate pursuit,* and assume[d] a jury verdict on this basis." (Emphasis added.) Id. The court recognized that "[Tetro's] complaint is not so limited. The jury having returned a general verdict against the [Stratford] defendants, [the court] must presume that the jury found every issue in favor of [Tetro], including the *claim of the [Stratford] defendants' negligence in [the officers'] manner of pursuit.*" (Emphasis added.) Id.; see id., 610–11 ("[s]ince the [Stratford] defendants do not contest the sufficiency of the evidence to support a finding on this claim of negligence, the jury's verdict must stand, *whether or not there was error with regard to the alleged failure to abandon pursuit of the Chevrolet*" (emphasis added; footnote omitted)).

Having based its holding on the general verdict rule, however, this court went on to observe, in dictum, that Connecticut's "common law and . . . statutes do not confer upon police officers, whose conduct is negligent, *blanket immunity from liability to an innocent bystander* by virtue of their engagement in the pursuit of persons whom they believe to have engaged in criminal behavior. [The court] note[d] again the salient circumstances of [the] case: the occupants of the Chevrolet were not endangering anyone when they were first confronted by [the officers]; the [officers], in violation of announced town policy, pursued the Chevrolet at high speeds through busy city thoroughfares, into a one-way street the wrong way. In these circumstances, the trial court correctly refused to direct a verdict for the [Stratford] defendants and left to the jury the determination of both negligence and of proximate cause as questions of fact." (Emphasis added.) Id., 611.

Ultimately, I agree with the majority's determination that *Tetro* provides only limited lessons with respect to the present case. First, this court relied on the general verdict rule and expressly declined to consider whether public policy precludes the imposition of liability arising from the decision whether to continue or terminate the pursuit standing by itself. See id., 610–11. Instead, the court focused on details relative to the "manner of the pursuit"; id., 610; such as the high speeds and the officers' decision to proceed the wrong direction on a one-way street, which, along with the fact that the occupants of the Chevrolet were not suspected of any serious offenses, rendered the officers' actions in conducting the high speed pursuit that much more negligent under the due care standard of § 14-283. Id., 611. The court's reliance on the general verdict rule eschewed any consideration of the decision to initiate or continue pursuit by itself.

Second, I agree with the majority that it is speculative to rely on *Tetro* as informative with respect to the immunity question at issue in this appeal, particularly because

none of the contemporary case law on that point—most notably *Shore* v. *Stonington*, supra, 187 Conn. 147, which was decided just one year before—was cited in *Tetro*.[9] Thus, I respectfully disagree with the dissent's conclusion that *Tetro* stands for the broader proposition that, in enacting § 52-557n in 1986, the legislature must have been aware that this court "had unanimously held in 1983 that a municipality was liable under existing law for police negligence during pursuits," and, therefore, had "the legislature wanted to establish an immunity rule for emergency vehicles generally, or police pursuits in particular, it surely would have made some reference to such a scenario in the 1986 codification."[10] Having received no guidance from *Tetro*,[11] I turn to other extratextual sources to determine whether § 14-283 governs the decision to engage in a pursuit.

Beginning with the relatively sparse legislative history, I note that the legislature enacted § 14-283 (d) as part of No. 538 of the 1971 Public Acts, entitled "An Act Granting Ambulances, Police and Fire Department Vehicles the Right of Way." The legislature intended the 1971 act to amend the existing version of § 14-283 to "[outline] in somewhat greater detail the restrictions upon and the advantages to police and fire department vehicles. It does not restrict them seriously, but it does call for slowing down at red lights and observation that the way is clear and such matters of that sort. It also outlines what the public is expected to do when a vehicle with its siren going is approaching them . . . along the lines of pulling parallel to the highway in order to not obstruct the passage of the vehicle." 14 H.R. Proc., Pt. 9, 1971 Sess., p. 4061, remarks of Representative Frank M. Reinhold. Testimony before the Transportation Committee indicates that the bill enacted as the 1971 act was intended to conform Connecticut law to the Uniform Vehicle Code by "clarify[ing] many of the areas [that] previously . . . were left up to chance. It will clarify the duties and rights and [responsibilities] of both the driver of the emergency vehicle as well as motorists and drivers of other vehicles."[12] Conn. Joint Standing Committee Hearings, Transportation, Pt. 3, 1971 Sess., p. 717, remarks of Bill Adint of the Connecticut Safety Commission; see also id., pp. 716–17, remarks of Lieutenant Michael Griffin of the Traffic Division of the Connecticut State Police ("This bill . . . requires [not only] that the motoring public grant the right of way to ambulances, [and] police and fire department vehicles under certain prescribed conditions, but it also places definite responsibilities upon the operators of these emergency vehicles. This bill also brings the Connecticut law into conformance with the Uniform Vehicle Code."); National Committee on Uniform Traffic Laws and Ordinances, Uniform Vehicle Code and Model Traffic Ordinance (1968 Rev.) § 11-106 (d), p. 135; National Committee on Uniform Traffic Laws and Ordinances, Uniform Vehicle Code (2000 Rev.) § 11-106 (d), p. 126.[13]

Because § 14-283 is intended to conform Connecticut law to the Uniform Vehicle Code, I find it helpful to consider sister state precedent considering emergency vehicle statutes that are based on the uniform law. See, e.g., *Friezo* v. *Friezo*, 281 Conn. 166, 187–88, 914 A.2d 533 (2007). The most comprehensive and persuasive analysis that my research has revealed is Justice Reif's dissent from the Oklahoma Supreme Court's decision in *State* v. *Gurich*, supra, 238 P.3d 1, which aptly blends both textual and policy considerations in concluding that the decision to pursue is distinct from the driving of the vehicle for purposes of Oklahoma's emergency vehicle statute, which is identical to § 14-283 for all relevant purposes. See id., 8–10 (Reif, J., dissenting). Justice Reif explains that subsection (a) of that statute sets forth "public interests protected by the privilege," namely, responding to emergency calls or engaging in pursuits, meaning that "*the decision* that the driver of an emergency vehicle should act for the purpose of protecting or advancing these public interests has been made by the [l]egislature." (Emphasis in original.) Id., 9 (Reif, J., dissenting). Justice Reif then posits that the remainder of the emergency vehicle statute functions to "balance the protection of these specific interests, with a more general interest of public safety," insofar as "the [l]egislature made exercise of the emergency vehicle privilege subject to certain conditions [such as use of emergency lights and sirens and slowing down as necessary for safe operation]. These conditions deal with the operation of the emergency vehicle." Id. Justice Reif emphasizes that the proviso—present in our § 14-283 (d)—that "[t]he provisions of this section shall not relieve the driver of an authorized emergency vehicle from the duty *to drive* with due regard for the safety of all persons," along with the Oklahoma statute's "consequences of reckless disregard" language; (emphasis in original; internal quotation marks omitted) id.; see footnote 13 of this opinion; states that it is "simply another condition on the exercise of the privilege. That is, a driver of an emergency vehicle who acts (drives) with reckless disregard loses the protection of the privilege. Conversely, a driver who maintains control of the emergency vehicle and does not harm anyone with the vehicle, remains within the privilege, breaches no duty, and commits no tort as a matter of law." *State* v. *Gurich*, supra, 9 (Reif, J., dissenting). Justice Reif emphasizes that, "once a pursuit is commenced, [the emergency vehicle statute] governs the action of the pursuing officer. The initiation of a pursuit and its continuation in compliance with [the emergency vehicle statute] creates nothing more than a condition for harm *caused* by the violator being pursued." (Emphasis in original.) Id. Beyond this textual analysis, Justice Reif observed that, "[i]n setting public policy, the [l]egislature has decided that the public benefit to be achieved by pursuit of violators outweighs any potential harm caused by the

violators being pursued, who are under a duty to stop . . . and [who] if they attempt to allude, commit a crime . . . ." Id., 10 (Reif, J., dissenting).

I find similarly instructive the Wisconsin Supreme Court's well reasoned decision in *Estate of Cavanaugh* v. *Andrade*, 202 Wis. 2d 290, 298 n.3, 315, 550 N.W.2d 103 (1996), which considered the intersection of Wisconsin's emergency vehicle statute and a governmental immunity statute that, like § 52-557n (a) (2) (B), afforded immunity to police officers for liability during the performance of discretionary acts. In *Cavanaugh*, the plaintiff's decedent was driving a car that was struck by a vehicle fleeing from the police at high speeds through a residential neighborhood. Id., 295–96. The court concluded that "an officer's decision to initiate or continue a [high speed] chase is a discretionary act entitled to immunity." Id., 315. Emphasizing that the emergency vehicle statute did not evince "an expression of clear legislative intent to abolish discretionary act immunity," the court observed that the application of discretionary act "immunity for an officer's decision to initiate or continue a pursuit does not mean . . . that officers are afforded blanket immunity from all liability by virtue of their involvement in a pursuit," stating that, under the emergency vehicle statute, "an officer may be negligent . . . for failing to physically operate his or her vehicle with due regard for the safety of others." Id., 317. The Wisconsin court distinguished "between an officer's discretionary decision to initiate and continue a pursuit and the physical operation of the vehicle," concluding that "the duty of due care created by the emergency vehicle statutes applies only to the operation of the emergency vehicle itself. The statutes exempt emergency drivers from certain operational rules of the road, such as obedience to speed limits, parking restrictions and stop signals. The statutes recognize the public necessity for a fire, ambulance or police vehicle in an emergency situation to be *driven* unhindered by the traffic rules governing ordinary vehicles. . . . [The plaintiff's] real objection is to [the officer's] decision to initiate and continue police pursuit. This is not the consideration addressed by [the emergency vehicle statutes]." (Emphasis in original; internal quotation marks omitted.) Id., 317–18; see also *Legue* v. *Racine*, 357 Wis. 2d 250, 291, 849 N.W.2d 837 (2014) ("*Cavanaugh* . . . attempted to segregate an officer's decision to initiate or continue a pursuit from that officer's physical operation of the vehicle with due regard under the circumstances for the safety of all persons").

Similarly, in *Lancaster* v. *Chambers*, 883 S.W.2d 650, 652 (Tex. 1994), the Texas Supreme Court addressed claims brought by plaintiffs whose son was the passenger on a motorcycle that crashed while fleeing during a police pursuit. The Texas court concluded that the state's emergency vehicle statute did not mandate "a holding that an officer has no discretion to drive without

due regard for the safety of all persons." Id., 655. The court concluded that that reading of the emergency vehicle statute would "[frustrate] official immunity's very function. If public officials perform their duties without negligence, they do not need immunity. The complex policy judgment reflected by the doctrine of official immunity, if it is to mean anything, protects officers from suit even if they acted negligently." Id. Instead, the court concluded that the "decision to pursue a particular suspect will fundamentally involve the officer's discretion, because the officer must, in the first instance, elect whether to undertake pursuit. Beyond the initial decision to engage in the chase, a high speed pursuit involves the officer's discretion on a number of levels, including, which route should be followed, at what speed, should [backup] be called for, and how closely should the fleeing vehicle be pursued. [The Texas court held] that these police [officers'] engaging in a [high speed] chase was a discretionary act." Id.; see *Pletan* v. *Gaines*, 494 N.W.2d 38, 39–41 and n.2 (Minn. 1992) (police officer's decision to pursue vehicle that had been involved in "snatch and grab" theft from clothing store and that struck child during chase was discretionary decision subject to official immunity doctrine governing "operational" discretion, despite state's emergency vehicle statute, because "[t]he issue . . . is not about how a police car should be driven during a pursuit, but whether a pursuit should have been undertaken in the first place or discontinued at some point after being undertaken"); *Colby* v. *Boyden*, 241 Va. 125, 129–31, 400 S.E.2d 184 (1991) (concluding that engaging in pursuit, including operation of vehicle during pursuit that struck plaintiff's car, is discretionary function for purposes of state's governmental immunity doctrine, which required plaintiff to prove gross negligence, despite "reasonable care" language in state's emergency vehicle statute); see also *Pinellas Park* v. *Brown*, 604 So. 2d 1222, 1226–28 (Fla. 1992) (extending discretionary immunity to police officers' decision to engage in pursuit via "actual execution of a [hot pursuit] policy" but concluding that "the method chosen for engaging in hot pursuit will remain an operational function that is not immune from liability if accomplished in a manner contrary to reason and public safety," such as in that case, in which twenty police vehicles engaged in high speed chase for nearly twenty-five miles in densely populated area and officers disobeyed supervisor's order to discontinue chase (emphasis omitted)); *Robinson* v. *Detroit*, 462 Mich. 439, 457, 613 N.W.2d 307 (2000) ("the decision to pursue a fleeing motorist, which is separate from the operation of the vehicle itself, is not encompassed within a narrow construction of the phrase 'operation of a motor vehicle'" for purposes of statute providing exception to governmental immunity resulting from "operation" of motor vehicle); *Tice* v. *Cramer*, 133 N.J. 347, 370–72, 627 A.2d 1090 (1993) (emergency vehicle statute did not affect absolute

immunity afforded police officers, in absence of wilful misconduct, for actions of fleeing or escaping offender and injuries resulting from pursuit).

Given that they arise under similar emergency vehicle statutes and governmental immunity schemes, I find these sister state cases highly instructive.[14] Accordingly, I conclude that deciding whether to engage in a vehicular pursuit of a fleeing suspect is not "driving" within the contemplation of § 14-283 (d) and, thus, remains a decision that is unique to law enforcement and rife with the exercise of professional discretion. "The decision to engage in a car chase and to continue the chase involves the weighing of many factors. How dangerous is the fleeing suspect and how important is it that he be caught? To what extent may the chase be dangerous to other persons because of weather, time of day, road, and traffic conditions? Are there alternatives to a car chase, such as a road block up ahead? These and other questions must be considered by the police officer in deciding whether  . . . to engage in a vehicular pursuit. And these questions must be resolved under emergency conditions with little time for reflection and often on the basis of incomplete and confusing information. It is difficult to think of a situation [in which] the exercise of significant, independent judgment and discretion would be more required." (Footnote omitted.) *Pletan* v. *Gaines*, supra, 494 N.W.2d 41.

I further agree with the majority's conclusion that the town and statewide pursuit policies at issue in this case, promulgated pursuant to the police pursuit statute, General Statutes § 14-283a,[15] do not change the inherently discretionary nature of the pursuit decision in this case. For example, § 14-283a-4 of the Regulations of Connecticut State Agencies,[16] governing the decision to initiate a pursuit, provides that "[t]he decision to initiate a pursuit shall be based on the pursuing police officer's conclusion that the immediate danger to the police officer and the public created by the pursuit is less than the immediate or potential danger to the public should the occupants of such vehicle remain at large." Regs., Conn. State Agencies § 14-283a-4 (a) (1). It then requires the officers to "take the following factors into consideration" in making that determination: (1) "[r]oad, weather and environmental conditions"; (2) "[p]opulation density and vehicular and pedestrian traffic"; (3) "[w]hether the identity of the occupants is known and immediate apprehension is not necessary to protect the public or police officers and apprehension at a later time is feasible"; (4) "[t]he relative performance capabilities of the pursuit vehicle and the vehicle being pursued"; (5) "[t]he seriousness of the offense"; and (6) "[t]he presence of other persons in the police vehicle." Id., § 14-283a-4 (a) (2) (A) through (F). Officers engaged in a pursuit are required to "continually re-evaluate and assess the pursuit situation, including all of the initiating factors, and terminate the pursuit when-

ever he or she reasonably believes that the risks associated with continued pursuit are greater than the public safety benefit of making an immediate apprehension."[17] Id., § 14-283a-4 (e) (1). I agree with the majority that the state regulations, and the very similarly worded town policy; see Seymour Police Department Pursuit Policy §§ 5.11.11 and 5.11.12; are written in a manner that we consider discretionary rather than mandatory— at least with respect to the multifactored decisions to engage in a pursuit.[18] "It is difficult to conceive of policy language that could more clearly contemplate the exercise of judgment by a municipal employee than is contemplated by the police response procedures in the present case." *Coley* v. *Hartford*, supra, 312 Conn. 165. "Because the policy language makes the manner of performance expressly contingent upon the police officer's discretion, it cannot be said that the alleged acts were to be performed in a prescribed manner without the exercise of judgment . . . ." (Internal quotation marks omitted.) Id., 166. Accordingly, I conclude that the decision to engage in pursuit in this case was discretionary for purposes of governmental immunity.

## II

"Three exceptions to discretionary act immunity are recognized,[19] but only one is relevant here: the identifiable person, imminent harm exception. Pursuant to this exception, liability is not precluded when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . ." (Footnote in original; internal quotation marks omitted.) *St. Pierre* v. *Plainfield*, 326 Conn. 420, 434–35, 165 A.3d 148 (2017). "[T]he identifiable person, imminent harm exception to qualified immunity for an employee's discretionary acts is applicable in an action brought under § 52-557n (a) to hold a municipality directly liable for those acts. . . . The exception requires three elements: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm . . . . We have stated previously that this exception to the general rule of governmental immunity for employees engaged in discretionary activities has received very limited recognition in this state. . . . If the plaintiffs fail to establish any one of the three prongs, this failure will be fatal to their claim that they come within the imminent harm exception. . . .

"An allegedly identifiable person must be identifiable as a potential victim of a specific imminent harm. Likewise, the alleged imminent harm must be imminent in terms of its impact on a specific identifiable person." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 435–36.

In a precedential vacuum,[20] the dissent's observation that, under the elements of the exception, no one would

be more of an identifiable person subject to imminent harm than the occupant of a car being pursued by the police makes logical sense. Even assuming, however, that the plaintiff satisfies all three prongs of the exception, "whether a particular plaintiff comes within a cognizable class of foreseeable victims for purposes of this exception . . . is ultimately a question of policy for the courts, in that it is in effect a question of duty . . . [that] involves a mixture of policy considerations and evolving expectations of a maturing society . . . ." (Citation omitted; internal quotation marks omitted.) *Prescott* v. *Meriden*, 273 Conn. 759, 763–64, 873 A.2d 175 (2005); see, e.g., *Strycharz* v. *Cady*, 323 Conn. 548, 575, 148 A.3d 1011 (2016), overruled in part on other grounds by *Ventura* v. *East Haven*, 330 Conn. 613, 199 A.3d 1 (2019); *Grady* v. *Somers*, supra, 294 Conn. 356; *Durrant* v. *Board of Education*, 284 Conn. 91, 100–101, 931 A.2d 859 (2007). Consistent with the public policy aspect of this inquiry, I join those courts that have held that a police officer owes no duty of care to an occupant of a car that he is pursuing, insofar as—in the absence of evidence otherwise—that passenger is presumed to be in cahoots with the person whose actions created the dangerous situation—namely, the person who led the officers on a chase in violation of his duty to stop pursuant to General Statutes § 14-223.[21] Cf. *Tetro* v. *Stratford*, supra, 189 Conn. 611 (dictum precluding "blanket immunity" for actions during pursuit limited to "liability to an innocent bystander").

Given its use of a multifactor duty analysis akin to Connecticut law; see, e.g., *Munn* v. *Hotchkiss School*, 326 Conn. 540, 548–50, 165 A.3d 1167 (2017); I find particularly instructive the Pennsylvania Supreme Court's decision in *Sellers* v. *Abington*, 630 Pa. 330, 106 A.3d 679 (2014), in which the decedent was a passenger who was ejected from a car that crashed while fleeing from police officers, who had attempted to stop the driver for suspected drunk driving. Id., 333–35. The court rejected the plaintiff's argument that Pennsylvania's emergency vehicle statute, requiring police officers engaged in pursuit "to drive with due regard for the safety of all persons," created a statutory duty to "unknown passengers" in a fleeing vehicle; (internal quotation marks omitted) id., 340, 349; defining "unknown passengers" as "passengers whose presence in the vehicle *or connection to the driver* is unknown to the pursuing officer." (Emphasis added; internal quotation marks omitted.) Id., 336 n.5. Recognizing that "emergency vehicle drivers still owe a [common-law] duty to the public at large, [that is] innocent bystanders," the court concluded that the officer had no common-law duty to the passenger, stating that it viewed "the relationship between the officers and passengers in a fleeing vehicle, in the broader context of the relationship the officer has to the community he or she serves. . . . An officer's relationship to the community

he or she serves hinges on the officer's ability to keep the members of the community safe from criminals, including dangerous drivers. Accordingly, where . . . the officer was unaware of the presence of a passenger in a fleeing vehicle, this first factor weighs against imposing a duty." (Citation omitted.) Id., 347–48. The court further stated that "the social utility of a police officer's attempt to apprehend a person suspected of violating the law is beyond dispute," which "is not curtailed by the addition of an unknown passenger in a fleeing vehicle." (Internal quotation marks omitted.) Id., 348. The Pennsylvania court emphasized: "Imposing a duty on officers to unknown passengers in a fleeing vehicle would present an unworkable burden on officers, essentially halting police pursuits. The decision to pursue a fleeing vehicle is one that must be made in a matter of seconds. To require officers to not only establish the presence of passengers, but also discover the relationship of the passengers to the fleeing driver, would be unmanageable in the necessarily [fast paced] environment of law enforcement. Moreover, officers, fearing the risk of civil liability, would be less likely to initiate pursuit, which would likely encourage criminals to flee." Id.

Similarly, in *Robinson* v. *Detroit*, supra, 462 Mich. 439, the Michigan Supreme Court observed: "Out of concern for public safety, [the] police must sometimes allow fleeing suspects to get away. However, it would be absurd to conclude that the police, out of concern for the safety of a fleeing criminal suspect, must cease pursuit of the fleeing suspect or risk possible civil liability." (Internal quotation marks omitted.) Id., 451. The court extended this rule to passengers, holding that "it is irrelevant whether a wrongdoer is a driver or a passenger or whether an innocent person is inside or outside the vehicle. . . . [W]hatever their location, there is a duty to innocent persons, but not to wrongdoers. In other words, the police owe a duty to innocent persons whether those persons are inside or outside the vehicle. Conversely, the police owe no duty to a wrongdoer, whether the wrongdoer is the fleeing driver or a passenger." Id. The court "place[d] on the plaintiff the burden of proving that a passenger was an innocent person and that the police therefore owed the passenger a duty." Id., 452; see *Fisher* v. *Miami-Dade County*, 883 So. 2d 335, 336–37 (Fla. App. 2004) (no duty of care to passenger in car being pursued by police, despite officers' apparent failure to follow procedures limiting pursuits to suspected violent felons), review denied, 901 So. 2d 873 (Fla. 2005); *Fawcett* v. *Adreon*, Docket No. M2000-00940-COA-R3-CV, 2001 WL 950159, *4 (Tenn. App. August 21, 2001) ("[I]n the absence of information to the contrary, a police officer can reasonably assume that the passenger in the fleeing vehicle is engaged in a common criminal activity with the driver and would therefore be a suspected violator of the law

under [Tennessee's emergency vehicle statute]. If the passenger in a fleeing vehicle is a 'suspected violator' and not a 'third party,' a municipality cannot be held liable for an injury to such a passenger resulting from a high speed police chase."); see also *Ombres* v. *Palm Beach Gardens*, 788 Fed. Appx. 665, 666, 668–69 (11th Cir. 2019) (The court followed *Fisher* and held that the officer owed no duty of care to the decedent, a passenger in a fleeing vehicle, because, although the evidence "did not show that [the passenger] encouraged the unlawful behavior, neither did it establish that the officer had reason to believe she was an unwilling passenger such as a kidnapping victim. Under those circumstances, Florida law treats the passenger of a fleeing car no differently than it does the driver of the car and does not impose a duty of care upon the pursuing officer."). But see *Holthusen* v. *United States*, 498 F. Supp. 2d 1236, 1243, 1244 (D. Minn. 2007) (holding that, under Minnesota law, "the officers' duty of care extends to a passenger in a vehicle being pursued" given "due regard for the safety of persons using the street" language in state's emergency vehicle statute (internal quotation marks omitted)); *Lancaster* v. *Chambers*, supra, 883 S.W.2d 653 (police officer had duty to passenger on motorcycle that he was pursuing because of "due regard for the safety of all persons" language in Texas' emergency vehicle statute (emphasis omitted; internal quotation marks omitted)). The record indicates that the circumstances of the decedent's death were undeniably tragic, with the driver of the Mustang resisting the entreaties of his front seat passenger to stop for the police. I nevertheless conclude that, in the absence of evidence that a pursuing police officer is aware of an innocent occupant of the vehicle—such as a kidnapping victim—that officer has no duty of care to the occupants of the vehicle that he is pursuing, given the state's interest in effective law enforcement and given that § 14-223, as an expression of public policy, places the responsibility to stop on the driver of the car being pursued.

I respectfully disagree with the dissent's reliance on § 14-283a, the pursuit statute; see footnote 15 of this opinion; in support of the proposition that public policy supports the imposition of a duty of care via a holding that the decedent was an identifiable person subject to imminent harm, because the "fatal accident that led to this case is precisely the type of tragedy the legislature was concerned with preventing when it promulgated and amended § 14-283a," and, "[i]f the young occupants of the Mustang convertible being pursued at a high rate of speed do not qualify as members of an identifiable class of likely victims, then the doctrine has become an absurdity." Although I agree with the dissent's observation that this "state has a strong public policy in favor of encouraging the safe operation of motor vehicles and discouraging police officers from initiating high

speed chases for minor vehicular infractions," I believe that it invades the purview of the legislature for this court to assert, as the dissent does, the judgment that "[n]othing is to be gained and more lives will be lost if we grant immunity to officers who engage in such chases in a negligent manner contrary to the spirit and purpose of §§ 52-557n, 14-283, 14-283a, and our common-law history."[22] Part III of the dissenting opinion; see *Tice* v. *Cramer*, supra, 133 N.J. 381 (observing that "[the] difficult policy question involved in this legislative choice between aggressive law enforcement and the numerous injuries alleged to be unjustified continues to rage" in concluding that absolute immunity was not inconsistent with legislation requiring adoption of police standards for initiation and conduct of pursuits and "efforts by the [s]tate to minimize the frequency and dangers of unwarranted or reckless police pursuits"). To me, this spate of legislative activity, including the recent amendments to § 14-283a highlighted by the dissent, shows that the legislature is well positioned to amend our governmental immunity and motor vehicle statutes to waive immunity and to allow a private right of action should it deem that remedy necessary to vindicate the public safety interests implicated by high speed police pursuits.[23] See, e.g., *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 550, 93 A.3d 1142 (2014) ("Given the continuing vigorous legislative debate on open government matters both in 1994 and today, we deem balancing the various interests and articulating a coherent policy on this matter to be a uniquely legislative function. The General Assembly retains the prerogative to modify or clarify [General Statutes] § 1-215 as it sees fit."); *Gerardi* v. *Bridgeport*, 294 Conn. 461, 472–73, 985 A.2d 328 (2010) (comparing electronic monitoring statute, General Statutes § 31-48d, to other employment statutes in concluding that legislature did not intend to create private right of action for violation of that statute). Accordingly, I conclude that the decedent was not an identifiable person subject to imminent harm because public policy does not support extending a legal duty from the pursuing officer to him.

I concur in and join the majority's judgment affirming the judgment of the trial court.

[1] The individual police officers are the named defendant, Officer Anthony Renaldi, Officer Michael Jasmin, and Sergeant William King.

[2] As the majority notes, "[a]lthough § 14-283 has been amended by the legislature since the events underlying the present case . . . these amendments have no bearing on the merits of this appeal." (Citation omitted.) Footnote 2 of the majority opinion. Therefore, I also refer to the current revision of the statute in this opinion.

General Statutes § 14-283 provides in relevant part: "(a) As used in this section, 'emergency vehicle' means any ambulance or vehicle operated by a member of an emergency medical service organization responding to an emergency call, any vehicle used by a fire department or by any officer of a fire department while on the way to a fire or while responding to an emergency call but not while returning from a fire or emergency call, any state or local police vehicle operated by a police officer or inspector of the Department of Motor Vehicles answering an emergency call or in the pursuit

of fleeing law violators or any Department of Correction vehicle operated by a Department of Correction officer while in the course of such officer's employment and while responding to an emergency call.

"(b) (1) The operator of any emergency vehicle may (A) park or stand such vehicle, irrespective of the provisions of this chapter, (B) except as provided in subdivision (2) of this subsection, proceed past any red light or stop signal or stop sign, but only after slowing down or stopping to the extent necessary for the safe operation of such vehicle, (C) exceed the posted speed limits or other speed limits imposed by or pursuant to section 14-218a or 14-219 as long as such operator does not endanger life or property by so doing, and (D) disregard statutes, ordinances or regulations governing direction of movement or turning in specific directions.

"(2) The operator of any emergency vehicle shall immediately bring such vehicle to a stop not less than ten feet from the front when approaching and not less than ten feet from the rear when overtaking or following any registered school bus on any highway or private road or in any parking area or on any school property when such school bus is displaying flashing red signal lights and such operator may then proceed as long as he or she does not endanger life or property by so doing.

"(c) The exemptions granted in this section shall apply only when an emergency vehicle is making use of an audible warning signal device, including but not limited to a siren, whistle or bell which meets the requirements of subsection (f) of section 14-80, and visible flashing or revolving lights which meet the requirements of sections 14-96p and 14-96q, and to any state or local police vehicle properly and lawfully making use of an audible warning signal device only.

"(d) The provisions of this section shall not relieve the operator of an emergency vehicle from the duty to drive with due regard for the safety of all persons and property. . . ."

[3] General Statutes § 52-557n provides in relevant part: "(a) (1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . . (2) *Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by*: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct; or (B) *negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.* . . ." (Emphasis added.) See also General Statutes § 52-557n (b) (providing specific immunities for certain acts).

[4] Thus, I respectfully disagree with the majority opinion to the extent it stands for the proposition that the "due regard" language in § 14-283 (d) renders the operation of an emergency vehicle inherently discretionary for purposes of immunity. Instead, I agree with the dissent that, although "the 'rules of the road' recognize and operate on the inherently discretionary nature of the activity we call driving" insofar as they "*demand* the exercise of discretion and good judgment," often in the "split-second" context, "our cases have never conferred immunity to [municipally employed] drivers in the ordinary course," "the legislature [has never] given any indication that it intend[ed] such a result by statute," and that a "rule of immunity would be exceedingly difficult to justify in this context because it would mean that our municipal employees would be free to drive negligently with impunity." (Emphasis in original.)

The breadth of this proposition was tested by a recent Appellate Court decision, which considered whether municipal police officers have a ministerial duty to obey all traffic laws in the absence of the emergency and pursuit situations set forth in § 14-283. See *Daley* v. *Kashmanian*, 193 Conn. App. 171, 187–88, 219 A.3d 499 (2019), petition for cert. filed (Conn. October 23, 2019) (No. 190245), and cross petition for cert. filed (Conn. November 1, 2019) (No. 190256); see also id., 185 n.7 (discussing Superior Court split as to whether operation of motor vehicle by police officers, even in emergency mode, is ministerial or discretionary activity). In *Daley*, the Appellate Court concluded that a police detective who engaged in a surveillance operation, while driving at high speeds in a "soft" car lacking emergency lights, was engaged in discretionary activity. Id., 187–88. The plaintiff in *Daley* has sought certification to appeal to this court on this issue.

[5] I respectfully disagree with the dissent to the extent it casts the decision to pursue in this case as one occasioned by a minor traffic violation, namely,

the underglow lights on the Mustang. The undisputed facts of this case indicate that, although Renaldi's attention was drawn to the Mustang because of the underglow lights, which led him to prepare to initiate a traffic stop, his decision to pursue was predicated on the fact that the driver of the Mustang, the decedent's friend Eric Ramirez, started to operate the Mustang recklessly upon spotting Renaldi's cruiser behind him, including illegally passing multiple vehicles on Route 67. In my view, ignoring this intervening act of reckless driving as giving rise to the pursuit in this case risks suggesting that a police officer should never initiate a traffic stop for a minor traffic violation because the simple fact of the stop might result in a pursuit situation.

[6] I agree with the dissent's observation that the complaint contains certain allegations that pertain to the manner of pursuit, namely, that Renaldi followed the Mustang at an unreasonably high rate of speed. That having been said, none of the arguments on appeal pertains to the operation of the police vehicle, as the plaintiff repeatedly emphasizes her reliance on what she characterizes as Renaldi's failure to engage in a thoughtful analysis before initiating the pursuit of the Mustang. As she states in her initial brief, the court is "not being called upon to dictate *how* police officers are to engage in the pursuit of a motor vehicle," but, rather, "the question before this court is limited to determining whether the legislature intended to create a ministerial obligation on officers to first account for the seriousness of the offense and the dangerousness of the pursuit before engaging in it when the legislature passed § 14-283. If this court does find such a ministerial duty, it falls to the jury to decide if that ministerial duty was violated in this case—that is to say, it falls to the jury to determine if the pursuing officers failed to take those factors into account . . . when they first engaged in an extremely dangerous nighttime pursuit [for] a minor traffic infraction. Looking to those facts, a jury could reason that, because the officers did engage in a dangerous nighttime pursuit on a narrow and windy road over a minor infraction, they therefore did so thoughtlessly, without regard to the strictures of § 14-283." (Emphasis in original.) Accordingly, consistent with the plaintiff's claims on appeal, I limit my analysis to the decision to engage in a pursuit.

[7] Another point counseling a narrow application of § 14-283 as an exception to governmental immunity is that the statute applies to entities beyond municipalities and their employees. For example, emergency vehicles are operated by state employees such as state troopers, who are subject to their own waiver of sovereign immunity with respect to the negligent operation of a motor vehicle; see General Statutes § 52-556; but § 14-283 also applies to employees of private entities that perform certain governmental functions, such as private ambulance companies and volunteer fire associations. See *Voltz* v. *Orange Volunteer Fire Assn., Inc.*, supra, 118 Conn. 310.

[8] I respectfully disagree with the majority's observation that *Tetro* v. *Stratford*, supra, 189 Conn. 601, is rendered less persuasive by its age and the fact that it was decided "prior to the codification of the common law in § 52-557n" and the evolution in our case law that has taken place since 1986. The legislature's act of codifying the common law would render *Tetro* highly instructive in the application and construction of § 52-557n, to the extent that it decided anything with respect to governmental immunity.

[9] This complete omission is particularly curious, given that one year before authoring the majority opinion in *Tetro*, former Chief Justice Peters dissented in *Shore* v. *Stonington*, supra, 187 Conn. 147, a discretionary act immunity case that has become paradigmatic for its application of the identifiable person, imminent harm exception. In that dissenting opinion, Justice Peters cited an Indiana decision for the proposition that, "[w]here a court relied on the distinction between discretionary and ministerial acts in determining the liability of a police officer, the hot pursuit of a suspect was held to be a ministerial act carrying liability for negligence and permitting a [common-law] action." *Shore* v. *Stonington*, supra, 160–61 (*Peters, J.*, dissenting); see *Seymour National Bank* v. *State*, 384 N.E.2d 1177, 1184–85 (Ind. App. 1979) (due care language in Indiana's emergency vehicle statute created duty of care owed by state trooper to motorist), vacated, 422 N.E.2d 1223 (Ind. 1981).

[10] Finally, and as I explain further in part II of this opinion, the public policy dictum in *Tetro* does not support the plaintiff in the present case, insofar as it is limited to "liability to an *innocent bystander*" rather than an occupant of the vehicle being pursued. (Emphasis added.) *Tetro* v. *Stratford*, supra, 189 Conn. 611.

[11] As is evident from its disparate treatment by the majority and the dissent, this court's opinion in *Tetro* offers a little something for everyone. I suggest

that the ambiguity of *Tetro* renders it a cautionary tale against the virtues of the pithy opinion—in the case of *Tetro*, three appellate issues resolved in ten pages of the Connecticut Reports—and unnecessary dictum. See *Tetro* v. *Stratford*, supra, 189 Conn. 602–11. Thus, I acknowledge that members of other state courts have construed *Tetro* like the dissent. See, e.g., *Estate of Cavanaugh* v. *Andrade*, 202 Wis. 2d 290, 325 and n.3, 550 N.W.2d 103 (1996) (Abrahamson, J., concurring in part and dissenting in part) (citing *Tetro* as illustrative of "a number of state supreme courts interpreting provisions substantially similar to [Wisconsin's discretionary act immunity statute that] have concluded that a law enforcement officer is not immune from liability for a discretionary decision to give or not to give chase and that the negligence standard is applicable to the officer's conduct").

[12] See, e.g., *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 314, 819 A.2d 260 (2003) ("[I]t is now well settled that testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation. . . . This is because legislation is a purposive act . . . and, therefore, identifying the particular problem that the legislature sought to resolve helps to identify the purpose or purposes for which the legislature used the language in question." (Internal quotation marks omitted.)).

[13] Subsection (d) of § 11-106 of the 2000 Uniform Vehicle Code provides: "The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of the driver's reckless disregard for the safety of others."

As the dissent observes, Connecticut's version of this provision does not contain the "reckless disregard" language. Some courts from states that have adopted this version of the Uniform Vehicle Code have construed this language "to require a standard of care higher than mere negligence, obligating plaintiffs to establish more consequential, material, and wanton acts to support a breach of the standard of care." *Robbins* v. *Wichita*, supra, 285 Kan. 467; see, e.g., *State* v. *Gurich*, supra, 238 P.3d 7–8 (decision to use "reckless disregard" standard of care was supported by statutory language and public policy considerations that reflect "the split-second life and death decisions involved in police pursuits"). But see *Pogoso* v. *Sarae*, 138 Haw. 518, 525–26, 382 P.3d 330 (App. 2016) (citing authorities indicating split among states on this point and adopting negligence standard of care, despite statute with "reckless disregard" language), cert. dismissed, Docket No. SCWC-12-0000402, 2017 WL 679187 (Haw. February 21, 2017).

[14] I note that there is some sister state authority holding to the contrary, namely, that the decision to engage in a pursuit is not discretionary for purposes of governmental immunity, but I view those cases as either poorly reasoned or distinguishable because they arise under immunity or statutory schemes that differ materially from Connecticut law. Some cases consider this question under a discretionary immunity scheme that is more constrictive than ours, insofar as they afford immunity for policymaking but not decisions on the operational level. See *Tice* v. *Cramer*, supra, 133 N.J. 366–67; *State* v. *Gurich*, supra, 238 P.3d 3–4; *Lowrimore* v. *Dimmitt*, 310 Or. 291, 296, 797 P.2d 1027 (1990); *Day* v. *State*, 980 P.2d 1171, 1180–81 (Utah 1999); *Mason* v. *Bitton*, 85 Wn. 2d 321, 328–29, 534 P.2d 1360 (1975); see also *Tetro* v. *Stratford*, supra, 189 Conn. 606–607 (citing *Mason* v. *Bitton*, supra, 326, as example of court holding that application of emergency vehicle statute is not limited to situation in which police vehicle itself is involved in accident).

There are similarly distinguishable cases from Maryland and Tennessee holding that there was no immunity under emergency vehicle statutes that specifically provided that law enforcement officers could be liable for injuries caused by a fleeing motorist during a pursuit when the " 'conduct of the law enforcement personnel was negligent . . . .' " (Emphasis omitted.) *Haynes* v. *Hamilton*, 883 S.W.2d 606, 609 (Tenn. 1994); see *Boyer* v. *State*, 323 Md. 558, 574–75, 594 A.2d 121 (1991) (statutory waiver of immunity for negligent "operation" of emergency vehicle, with "operation" deemed broader than "driving"); *Haynes* v. *Hamilton*, supra, 611 ("an officer's decision to commence or continue a [high speed] chase is encompassed within the statutory term 'conduct' and may form the basis of liability in an action brought by a third party who is injured by the fleeing suspect, if the officer's decision was unreasonable").

This brings me, then, to the Kansas Supreme Court's decision in *Robbins* v. *Wichita*, supra, 285 Kan. 455, relied on by the dissent, which followed the Tennessee and Maryland courts, respectively, in *Haynes* and *Boyer*. The

Kansas court "refus[ed] to distinguish between the decision to pursue and continue the pursuit from the method of pursuing. The language of [the Kansas emergency vehicle statute] requires the drivers of emergency vehicles to 'drive with due regard for the safety of all persons.' [The Kansas court] believe[d] [that] the act of driving involves both the mental and physical components." Id., 465. In so holding, the Kansas court overruled its earlier decision in *Thornton* v. *Shore*, 233 Kan. 737, 666 P.2d 655 (1983), on which the Wisconsin court in *Estate of Cavanaugh* v. *Andrade*, supra, 202 Wis. 2d 290, relied, and concluded that it was "unable to distinguish between the decision to pursue and the method of pursuing. Thus, [the Kansas court] overrule[d] that portion of the *Thornton* decision that exempts the decision to pursue and continue the pursuit from the duty found in [the emergency vehicle statute]." *Robbins* v. *Wichita*, supra, 465–66. I respectfully disagree with the reasoning in *Robbins*. First, it does not account for the distinct statutory language that formed the bases for the Tennessee and Maryland decisions in *Haynes* and *Boyer*, respectively, which considered liability for negligent "operation" or "conduct" rather than just "driving." Second, its immunity determination does not account for the complexity of the decision to pursue or continue pursuit. Accordingly, I decline to follow *Robbins*, along with the Oklahoma Supreme Court's majority opinion in *State* v. *Gurich*, supra, 238 P.3d 5–6, which follows the reasoning of *Robbins* on this point. See also *Legue* v. *Racine*, supra, 357 Wis. 2d 292–93 (The court criticized the distinction between operation and making the decision to pursue drawn in *Estate of Cavanaugh* v. *Andrade*, supra, 202 Wis. 2d 290, as suffering from "theoretical and practical difficulties . . . ." Nonetheless, the court concluded that *Cavanaugh* "retains vitality and is instructive" on the point that, under the emergency vehicle statute, "an officer must still treat all persons and vehicles with 'due regard under the circumstances,' notwithstanding the discretionary decision of the officer to engage in a [high speed] pursuit or respond to an emergency call. *Cavanaugh* instructs that the duties of the officer to operate the vehicle are not subsumed by an initial discretionary decision.").

[15] General Statutes § 14-283a recently was amended by No. 19-90, § 5, of the 2019 Public Acts, which made technical changes to the statute that are not relevant to this appeal. For purposes of clarity, I refer to the current revision of § 14-283a, which provides in relevant part: "(a) As used in this section, 'police officer' and 'law enforcement unit' have the same meanings as provided in section 7-294a, and 'pursuit' means an attempt by a police officer in an authorized emergency vehicle to apprehend any occupant of another moving motor vehicle, when the driver of the fleeing motor vehicle is attempting to avoid apprehension by maintaining or increasing the speed of such vehicle or by ignoring the police officer's attempt to stop such vehicle.

"(b) (1) The Commissioner of Emergency Services and Public Protection, in conjunction with the Chief State's Attorney, the Police Officer Standards and Training Council, the Connecticut Police Chiefs Association and the Connecticut Coalition of Police and Correctional Officers, shall adopt, in accordance with the provisions of chapter 54, a uniform, state-wide policy for handling pursuits by police officers. Such policy shall specify: (A) The conditions under which a police officer may engage in a pursuit and discontinue a pursuit, (B) alternative measures to be employed by any such police officer in order to apprehend any occupant of the fleeing motor vehicle or to impede the movement of such motor vehicle, (C) the coordination and responsibility, including control over the pursuit, of supervisory personnel and the police officer engaged in such pursuit, (D) in the case of a pursuit that may proceed and continue into another municipality, (i) the requirement to notify and the procedures to be used to notify the police department in such other municipality or, if there is no organized police department in such other municipality, the officers responsible for law enforcement in such other municipality, that there is a pursuit in progress, and (ii) the coordination and responsibility of supervisory personnel in each such municipality and the police officer engaged in such pursuit, (E) the type and amount of training in pursuits, that each police officer shall undergo, which may include training in vehicle simulators, if vehicle simulator training is determined to be necessary, and (F) that a police officer immediately notify supervisory personnel or the officer in charge after the police officer begins a pursuit. The chief of police or Commissioner of Emergency Services and Public Protection, as the case may be, shall inform each officer within such chief's or said commissioner's department and each officer responsible for law enforcement in a municipality in which there is no such department of the existence of the policy of pursuit to be employed by any such officer

and shall take whatever measures that are necessary to assure that each such officer understands the pursuit policy established.

"(2) Not later than January 1, 2021, and at least once during each five-year period thereafter, the Commissioner of Emergency Services and Public Protection, in conjunction with the Chief State's Attorney, the Police Officer Standards and Training Council, the Connecticut Police Chiefs Association and the Connecticut Coalition of Police and Correctional Officers, shall adopt regulations in accordance with the provisions of chapter 54, to update such policy adopted pursuant to subdivision (1) of this subsection.

"(c) No police officer engaged in a pursuit shall discharge any firearm into or at a fleeing motor vehicle, unless such officer has a reasonable belief that there is an imminent threat of death to such officer or another person posed by the fleeing motor vehicle or an occupant of such motor vehicle.

"(d) No police officer shall intentionally position his or her body in front of a fleeing motor vehicle, unless such action is a tactic approved by the law enforcement unit that employs such police officer.

"(e) If a pursuit enters the jurisdiction of a law enforcement unit other than that of the unit which initiated the pursuit, the law enforcement unit that initiated the pursuit shall immediately notify the law enforcement unit that has jurisdiction over such area of such pursuit.

"(f) (1) Not later than December 1, 2018, the Police Officer Standards and Training Council, established under section 7-294b, shall develop and promulgate a standardized form for (A) reporting pursuits by police officers pursuant to subdivision (2) of this subsection, and (B) submitting annual reports pursuant to subdivision (3) of this subsection. . . ."

[16] See footnote 9 of the majority opinion (complete text of relevant state regulations).

[17] Under the statewide pursuit policy, a police supervisor is authorized to "order the termination of a pursuit at any time and shall order the termination of a pursuit when the potential danger to the public outweighs the need for immediate apprehension. Such decision shall be based on information known to the supervisor at the time of the pursuit." (Emphasis omitted.) Regs., Conn. State Agencies § 14-283a-4 (e) (3). Similarly, a "pursuit may be terminated" when communications problems arise among the police units involved, or "if the identity of the occupants has been determined, immediate apprehension is not necessary to protect the public or police officers, and apprehension at a later time is feasible." Id., § 14-283a-4 (e) (4) and (5).

[18] I note that there are certain portions of the town and statewide policies governing the manner of pursuit that are phrased in a manner that is susceptible to being read as imposing a ministerial duty, such as mandating the use of emergency lights and sirens during the pursuit and requiring officers to discontinue pursuit when directed by a supervisor, or precluding certain units from engaging in pursuit. See Regs., Conn. State Agencies § 14-283a-4 (b) (2) ("Upon engaging in or entering into a pursuit, the pursuing vehicle shall activate appropriate warning equipment. An audible warning device shall be used during all such pursuits."); Seymour Police Department Pursuit Policy § 5.11.12 (B) (1) ("As soon as the operator of a pursued vehicle increases his speed or drives in such a manner as to endanger safety of others, the pursuing officer shall immediately activate both siren and emergency dome lights, and shall use both throughout the entire pursuit. The purpose of the lights and siren is primarily to warn motorists of unusual vehicular movements."); Seymour Police Department Pursuit Policy § 5.11.12 (C) ("[u]nits that have prisoners, witnesses, suspects, complainants, or other non-law enforcement personnel as passengers, shall not become engaged in pursuit situations"); Seymour Police Department Pursuit Policy § 5.11.12 (D) (1) ("[i]f an officer receives a communication from the dispatcher that the chase be terminated, he shall do so immediately, reporting to the dispatcher the final location and direction of travel of the pursued vehicle at the time of termination").

I leave to another day whether these portions of the policies impose ministerial duties but recognize that the Minnesota Supreme Court has rejected the argument that "all police conduct in emergency situations is discretionary," stating that "governmental entities have the authority to eliminate by policy the discretion of their employees . . . . Moreover, the existence of such policies reveals a belief that certain situations do not justify the creation of the risk attendant to police chases." *Mumm* v. *Mornson*, 708 N.W.2d 475, 493 (Minn. 2006); see id., 491–92 (officers violated ministerial duty by failing to discontinue pursuit when language of department policy mandated termination of pursuit, identity of pursued party was known,

and pursued party was not suspected of certain violent felonies); see also *Benedict* v. *Norfolk*, 296 Conn. 518, 520 n.4, 997 A.2d 449 (2010) (municipal acts are "deemed ministerial [only] if a policy or rule limiting discretion in the completion of such acts exists").

[19] "Liability for a municipality's discretionary act is not precluded when (1) the alleged conduct involves malice, wantonness or intent to injure; (2) a statute provides for a cause of action against a municipality or municipal official for failure to enforce certain laws; or (3) the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . ." (Internal quotation marks omitted.) *St. Pierre* v. *Plainfield*, 326 Conn. 420, 434 n.13, 165 A.3d 148 (2017).

[20] The dissent raises some compelling observations about what it considers to be this court's unduly restrictive approach to the first prong of the test, under which "we [generally] have held that a party is an identifiable person when he or she is compelled to be somewhere," and "[t]he only identifiable class of foreseeable victims that we have recognized . . . is that of schoolchildren attending public schools during school hours because: they were intended to be the beneficiaries of particular duties of care imposed by law on school officials; they [are] legally required to attend school rather than being there voluntarily; their parents [are] thus statutorily required to relinquish their custody to those officials during those hours; and, as a matter of policy, they traditionally require special consideration in the face of dangerous conditions." (Internal quotation marks omitted.) *St. Pierre* v. *Plainfield*, supra, 326 Conn. 436; see id., 436–37 and n.15 (discussing *Sestito* v. *Groton*, 178 Conn. 520, 423 A.2d 165 (1979), and noting that, "[o]utside of the schoolchildren context, we have recognized an identifiable person under this exception in only one case that has since been limited to its facts," and, "although we have addressed claims that a plaintiff is an identifiable person or member of an identifiable class of foreseeable victims in a number of cases, we have not broadened our definition").

A long line of cases illustrates how well established the compulsion aspect is to the identifiability element of the exception. See, e.g., id., 438 (person injured while attending aqua therapy session at municipal pool was not subject to exception); *Grady* v. *Somers*, supra, 294 Conn. 356–57 (town resident using transfer station was not subject to exception); *Prescott* v. *Meriden*, supra, 273 Conn. 759, 764–66, 873 A.2d 175 (2005) (parent attending high school football game was not subject to exception); *Durrant* v. *Board of Education*, 284 Conn. 91, 109–110, 931 A.2d 859 (2007) (parent picking up her child from after-school program held at public school was not subject to exception); see also *Shore* v. *Stonington*, supra, 187 Conn. 153–54 (motorist on road was not identifiable person subject to imminent harm, even when police officer exercised discretion to let apparently drunk driver go on his way after traffic stop).

[21] General Statutes § 14-223 provides in relevant part: "(a) Whenever the operator of any motor vehicle fails promptly to bring his motor vehicle to a full stop upon the signal of any officer in uniform or prominently displaying the badge of his office, or disobeys the direction of such officer with relation to the operation of his motor vehicle, he shall be deemed to have committed an infraction and be fined fifty dollars.

"(b) No person operating a motor vehicle, when signaled to stop by an officer in a police vehicle using an audible signal device or flashing or revolving lights, shall increase the speed of the motor vehicle in an attempt to escape or elude such police officer. Any person who violates this subsection shall be guilty of a class A misdemeanor, except that, if such violation causes the death or serious physical injury, as defined in section 53a-3, of another person, such person shall be guilty of a class C felony, and shall have such person's motor vehicle operator's license suspended for one year for the first offense . . . ."

[22] I respectfully disagree with the dissent's assertion that my reading of the pursuit and immunity statutes amounts to "substituting [my] own policy preferences for those policies established by the legislature," despite an ostensible "deference to legislative prerogative . . . ." In my view, the correctness of the dissent's policy analysis with respect to § 14-283a wholly depends on the validity of its conclusion that the decision to pursue is inextricable from the conduct of the pursuit for purposes of § 14-283 (d), a conclusion with which I have stated my disagreement in part I of this opinion.

[23] For example, the legislature has specifically waived sovereign immunity with respect to the negligence of state officials and employees operating state owned and insured motor vehicles. See General Statutes § 52-556. An

example of a more targeted waiver of governmental immunity in the pursuit context is Florida's pursuit statute. See Fla. Stat. Ann. § 768.28 (9) (d) (West Supp. 2020) ("The employing agency of a law enforcement officer as defined in [§] 943.10 is not liable for injury, death, or property damage effected or caused by a person fleeing from a law enforcement officer in a motor vehicle if: 1. The pursuit is conducted in a manner that does not involve conduct by the officer which is so reckless or wanting in care as to constitute disregard of human life, human rights, safety, or the property of another; 2. At the time the law enforcement officer initiates the pursuit, the officer reasonably believes that the person fleeing has committed a forcible felony as defined in [§] 776.08; and 3. The pursuit is conducted by the officer pursuant to a written policy governing high-speed pursuit adopted by the employing agency. The policy must contain specific procedures concerning the proper method to initiate and terminate high-speed pursuit. The law enforcement officer must have received instructional training from the employing agency on the written policy governing high-speed pursuit."). Similarly, the legislature might consider an amendment to the emergency vehicle statute to clarify more specifically the scope extent to which it waives governmental immunity in that area, such as by adapting the "reckless disregard" language used in other states. See footnote 13 of this opinion.

---